THOMPSON and others *v.* THE NEW YORK AND HARLEM RAIL ROAD COMPANY and others.

THE legislature in 1790, authorized M. to erect a toll bridge across a navigable river or arm of the sea, where the tide flowed, and to maintain the same for sixty years; and the act provided that it should not be lawful for any person or persons to erect or maintain a bridge or ferry, between the two places which were to be connected by M.'s bridge. The toll bridge was built accordingly. In 1832, the legislature authorized the construction of a railway across the same river, between two distant places, which would necessarily cross the river at or near such bridge, and which was constructed and was carried across the river by a bridge, one-fourth of a mile distant from the former; and in its operation the railroad diminished by one-third, the accustomed receipts of the toll bridge;

*Held*, 1. That the act conferring the franchise on M., was not a covenant or grant that no similar franchise should be conferred on others; and did not restrict the authority of a future legislature, to establish a toll bridge or ferry at the same place.

2. That the grant to the rail road company did not impair the obligation of any contract with M., within the meaning of the prohibition in the constitution of the United States.

3. That the franchise granted to the rail road company, was not the same as that conferred on M., nor so similar as to be deemed an interference with the latter, in the sense in which a new bridge or ferry interferes with one previously established at the same point.

4. That if it were a direct interference, the rail road company were authorized to erect and maintain a bridge for the use of their railway, adjacent to M.'s bridge, and the act granting them the power was valid.

It is the province and the right of the legislature, in the exercise of its sovereign duty to provide ways for the use of the people, to authorize the construction and use of newly invented or improved modes of conveying passengers and freight; although the necessary consequence may be, that profitable modes of conveyance in actual use, will thereby be superseded, although those engaged in them will be subjected to the loss of their business and capital; and although valuable franchises previously conferred by the legislature in respect of such old modes, will be rendered unavailable and worthless.

There is no implication of an exclusive right to a franchise, where the charter or act conferring it, is silent on the subject.

A statute, authorizing an individual to erect a bridge, and to receive tolls for its use, confers upon him a franchise; and a substantial compliance with the conditions imposed by the act, will invest him with its rights and privileges.

VOL. III.                    79

Thompson v. The N. Y. and Harlem Rail Road Company.

Where a franchise has become vested in the donee or grantee, it is no defence to a suit brought by him to assert or maintain the franchise, that he has forfeited it by any subsequent acts of commission or omission.

There must be a judicial forfeiture of the franchise, at the suit of the state, before individuals can avail themselves of such acts. It cannot be impeached collaterally.

Where an act conferring a franchise to build a bridge and to take tolls, provided that the owner of any unauthorized bridge or vessel used to transport passengers at the same point, should pay treble tolls, to be recovered by the donee in an action of debt before a justice; in a suit in equity by the owner of the bridge, against a corporation, for a violation of his franchise through a new bridge, aleged to be unauthorized;

*Held*, 1. That the remedy given by the act was cumulative, and did not preclude the donee from resorting to other actions.

2. If the act were otherwise, the necessity of the case would warrant another remedy, as the corporation could not be sued before a justice.

3. That chancery has jurisdiction to restrain by injunction, the unlawful use of the new bridge, at the suit of the owner of the franchise.

4. That chancery would not maintain a suit in his behalf for an account of the tolls lost through the use of the new bridge; but if a case were made for its interposition by way of injunction, it would decree an account as an incident to such relief.

5. That this court would not enforce the penalty provided by the act.

The proprietors of a toll bridge authorized by law, several years after the bridge was built, were incorporated by the legislature. There was no distinct evidence that they accepted the charter, there was proof of some of their own proceedings declining it; and in a *quo warranto* against them by the attorney general, for assuming to act as a body politic, they had traversed the allegation, and that officer had thereupon entered a judgment of preclusion.—*Held*, that these facts proved that they had not accepted the charter, and were conclusive on the point that they did not thereby become a body politic or corporate.

A rail road company was chartered with power to build a bridge for their railway across a river. At or near the place where it was to cross, a private bridge had been erected by individuals duly authorized by law, to build a bridge for their own private use, which was entirely convenient, and of sufficient strength for the purposes of the rail road; and the company purchased the bridge of the owners, reserving to the latter the use of it as before.—*Held*, that the owners were authorized to sell, and the company to buy the bridge.

A corporation authorized by law to build a bridge at a given point, may buy one already built at the same point, if suitable for their purpose.

February 17, 18, 19, 20, 21; July 21, 1846.

THE bill was filed September 16, 1843, by Samuel M. Thompson and others, as the proprietors of the toll bridge over the Harlem river at Harlem, against The New York and Harlem Rail

Road Company, Gouverneur Morris, Lewis Morris, Gerard W. Morris, William H. Morris, Richard V. Morris, Henry Morris, and Richard L. Morris; for the purpose of restraining the defendants from violating the complainants franchise through and by means of the rail road bridge at Harlem, and for an account in respect of the loss of tolls occasioned to them thereby. The three defendants first named put in separate answers, and the other defendants joined in an answer to the bill. All the defendants set up objections to the complainants right, and justified the erection and maintenance of the rail road bridge; and they traversed the alleged loss of tolls to the complainants.

The pleadings and testimony were very voluminous. The questions presented by the pleadings, are mentioned in the opinion of the court. The following is a statement of the facts admitted and proved, by the respective parties.

In May, 1666, Governor Nicolls, by letters patent, granted to the freeholders and inhabitants of Harlem on Manhattan island, a tract of land on the Harlem river, and extending along the East river; and with other privileges, gave to them the right of maintaining a ferry to the main land. On the 7th of March, 1686, a confirmation of this patent was granted by Governor Dongan.

On the 25th day of March, 1676, Governor Andross, by letters patent, confirmed unto Col. Richard Morris, a tract of land, described as being upon the main over against the town of Harlem, containing 250 morgan or 500 acres, besides the meadow annexed, as butted in the original Dutch ground briefe; and by the same patent, granted to Col. Morris, a further tract adjacent to the former grant, containing fourteen hundred acres and extending from Harlem river to the Sound, and along Bronx Kill. On the 6th of May, 1697, Governor Fletcher, by letters patent, confirmed these grants, to Lewis Morris the nephew and heir of the former patentee, and erected the same into the lordship or manor of Morrisania in the county of Westchester; and among other rights and privileges, conferred on him the right of bridges and ferries.

On the thirty-first day of March, 1790, the legislature passed

an act entitled, " An act for building a bridge across Harlem River," in the following words :

" I. Be it enacted by the people of the state of New York, represented in Senate and Assembly, and it is hereby enacted by the authority of the same, That Lewis Morris, his heirs or assigns, be and he and they are hereby empowered and authorized at his and their own expense, to build a bridge from Harlem, across Harlem River, to Morrisania, agreeable to the dimensions and directions following, that is to say : The said bridge shall not be less than thirty feet in width, and between the centre arches thereof shall be an opening not less than twenty-five feet, over which shall be a draw not less than twelve feet ; for the free passage of vessels with fixed standing masts ; and that it shall and may be lawful for the said Lewis Morris, his heirs or assigns, for and during the term of sixty years, to ask, demand and take, for the use of the said bridge, a toll, not exceeding the following rates, viz. : For every four wheel pleasure carriage and horses, two shillings ; for every two wheel pleasure carriage, or sleigh and horses, one shilling ; for every wagon and horses, nine pence ; for every market sled and horses, nine pence ; for every ox cart and oxen, nine pence ; for every one horse cart and horse, six pence ; for every man and horse, six pence ; for every ox, cow or steer, two pence ; for every sheep, hog or calf, one penny ; for every single passenger, three pence.

II. And be it further enacted by the authority aforesaid, That it shall not be lawful for any person or persons whatsoever, to erect or cause to be erected any other bridge over or across the said Harlem River to Morrisania, or to keep any scow, flat or other vessel, to ferry any person over or across the said Harlem River from Morrisania to Harlem, except for the private use of the inhabitants of the townships of Harlem and Morrisania ; and if any such bridge shall be erected, or such scow, flat or other vessel be used as aforesaid, except by the inhabitants of the said townships of Harlem or Morrisania, the owner of such bridge, scow, flat or other vessel, shall pay to the said Lewis Morris, his heirs, executors, administrators or assigns, treble the toll hereinbefore specified, to be recovered in any suit or action of debt, before any justice or justices of the peace having cognizance of the same."

The act then provided for the laying out of a road by commissioners, from the bridge to Eastchester, the particulars of which are unimportant. (Laws of 13 Sess. Chapt. 37; 2 Kent & Radcl. 489.)

Lewis Morris assigned all his rights under this act, to John B. Coles, prior to 1795; and on the 24th of March, 1795, the legislature passed an act, entitled "An act to enable John B. Coles to raise a dam across Harlem River, and to amend an act entitled 'an act for building a bridge across Harlem River,'" which is in the words following, to wit:

" Whereas, in and by an act, entitled an 'act for building a bridge across Harlem River,' passed March 31st, 1790, Lewis Morris, his heirs and assigns, were authorized at his and their own expense to build a bridge across Harlem River, agreeably to the directions and dimensions therein specified, and for the term of sixty years, to ask, demand and take, for the use of the said bridge, a toll not exceeding the rates in the said act mentioned: And whereas the said Lewis Morris hath assigned his right to build the said bridge, and proposals have been made by John B. Coles to the assignees of the said Lewis Morris to raise a dam of stone for the purpose of erecting mills thereon, and to be the foundation of the bridge aforesaid: therefore,

I. Be it enacted by the people of the state of New York, represented in Senate and Assembly, that John B. Coles, his heirs and assigns, shall be, and he and they are authorized to build a dam across Harlem River, at such place as is or shall be determined on by the assignees of the said Lewis Morris, in pursuance of the act above recited; and such dam shall be made of stone, and shall be so constructed as to be the foundation of the bridge aforesaid, and for collecting the water of the said river for the use of grist and other mills.

II. And be it further enacted, that the said John B. Coles, his heirs or assigns, at his and their own expense, shall make and keep in repair a lock, and shall provide and keep a sufficient person to attend the same, that no unnecessary delay may happen to those who may have occasion to pass through the said lock with boats; that the width of said lock be eight feet, and so

constructed as that a vessel drawing two feet of water may at low water enter such lock, and that the length be forty feet.

III. And be it further enacted, that all persons whose meadows and sedges may be injured, damaged or destroyed by the water so ponded up as aforesaid, shall be paid the amount of the damages he, she or they may so sustain, in the manner following: the amount of the damages that so as aforesaid shall be sustained, shall be determined, set and appraised by two justices of the peace, and by the oath of twelve freeholders not having any interest in the premises; and the said freeholders shall be summoned by a constable of the town or ward in which such damages shall have been sustained, by virtue of a warrant to be issued by the said two justices of the peace for that purpose, on the application of any person sustaining damages as aforesaid ; the whole of the said damages, together with the charges of the said justices and jury, and of the whole proceedings thereon had, if any damages shall be found, shall be paid by the said John B. Coles, his heirs or assigns, within thirty days after notice to him or them given of the inquisition so taken as aforesaid.

IV. And be it further enacted, that in case the said John B. Coles, his heirs or assigns, shall neglect to keep the said lock in sufficient repair, or to furnish such attendance thereat, as to prevent the free passage of boats, he or they shall for every such neglect forfeit the sum of two pounds, to be recovered, with costs of suit, before any justice of the peace by any person who will prosecute for the same.

V. And be it further enacted, that the said bridge shall not be less than twenty-four feet, any thing in the act above recited to the contrary notwithstanding.

VI. And be it further enacted, that the said John B. Coles, his heirs and assigns, shall give security to the treasurer of this state in the penal sum of four thousand pounds, conditioned that he or they shall erect and complete the said bridge within four years after the passing of this act ; and that he or they will preserve the same in good and sufficient repair during the term of sixty years after the building and completing of said bridge ; and at the expiration of which term of sixty years, the said bridge shall vest in and become the property of the people of this state.

VII. And be it further enacted, that from and after the expiration of the said sixty years, the said John B. Coles, his heirs and assigns, for ever, shall have, hold and enjoy the use of the waters so ponded up for any mill or mills which he or they or any of them may have erected, or shall erect, and also the use of the aforesaid dam, provided that he or they shall keep in repair the said dam and lock, at his and their proper expense, and keep a person to attend the said lock in manner herein before mentioned." (18th Session, Chapt. 31; 2 Kent & R. 490.)

By virtue of these acts, John B. Coles in 1796, erected a bridge of wood, across the Harlem River, (which separates the city of New York from the county of Westchester,) having an opening of twenty-five feet in width, over which was placed a draw twelve feet wide for the passage of vessels with standing masts. The bridge itself was of the width of twenty-four feet. He also executed to the treasurer of the state, the bond required by the sixth section of the act of 1795. The stone dam mentioned in that act, was never erected. On the 8th day of October, 1796, Lewis Morris executed to Coles, a conveyance in due form, of all his rights to the toll bridge and the franchises granted by the act of 1790.

The road to Eastchester, provided in the act of 1790, was laid out; but not being fully opened or made available, the legislature on the 30th of March, 1797, passed an act in these words, viz.

" An act for the relief of John B. Coles, and to provide for the laying out of new roads. Whereas John B. Coles hath erected a bridge across Harlem River, in pursuance of an act, entitled ' an act for building a bridge across Harlem River,' and another act, entitled ' an act to enable John B. Coles to raise a dam across Harlem River, and to amend an act, entitled an act for building a bridge across Harlem River.' And whereas it is represented to the legislature, that although the commissioners named for that purpose in the first above mentioned act, had laid out a road from the said bridge to Eastchester, yet the damages to the persons through whose land it was laid out, are not paid, and some part of the said road is not opened; and that the said John B. Coles has already expended a considerable sum of money in

making, clearing and amending the said road; and that it will require further large sums for that purpose, besides what can be done in the ordinary mode of making and repairing highways in this state. And whereas the said John B. Coles hath prayed relief in the premises. Therefore,

I. Be it enacted by the people of the state of New York, represented in Senate and Assembly, That the said road so laid out shall be, and hereby is established as a public highway from and after the passing of this act; and shall and may be immediately opened as a public highway, although the damages to the persons, or any or either of them, through whose land the same is laid out, may not be paid. And it shall and may be lawful for the said John B. Coles and his assigns, at his and their expense, to cause the said road to be cleared and properly made, for the convenience of travellers, and all others having occasion to use the same road ; and as soon as the same road shall be made and cleared as aforesaid, then and from thenceforth it shall and may be lawful for the said John B. Coles and his assigns, for and during the term of thirty years, to demand and take an additional toll for passing the said bridge, not exceeding fifty per cent. above what is allowed by the acts aforesaid, or either of them ; and that the said John B. Coles shall, at his own expense, keep the said road in repair, during the term he shall exact any additional toll for passing the said bridge." (20th Sess., chapt. 63 ; 2 K. & R. 491.) The second section of this act was repealed the following year.

On the 3d of April, 1798, another act was passed by the legislature, as follows:

" An Act to amend the act, entitled An Act for the relief of John B. Coles, and to provide for laying out new roads.

I. Be it enacted by the people of the state of New York, represented in Senate and Assembly, That the term of thirty years, allowed in and by the act, entitled 'An act for the relief of John B. Coles, and to provide for laying out new roads,' shall be, and hereby is extended to the term of sixty years, from the thirty-first day of March last; and that so much of the said act as de-clares that the said John B. Coles shall, at his own expense, keep the road from the bridge across Harlem River to Eastchester in

repair, during the time he shall exact any additional toll for passing the said bridge, shall be, and the same is hereby repealed.  Provided, nevertheless,

II.  And be it further enacted, That the said John B. Coles shall lay out and expend, in repairing the said road, one hundred dollars, by the first day of July, in each year, during the term he shall exact or take an additional toll of more than twenty-five per cent. for passing over his bridge, in such manner that each of the towns of Westchester and Eastchester shall be benefitted thereby, in proportion to the work necessary to be done on the said road in each of the said towns ; and shall render an account of the expenditure of the said one hundred dollars to the commissioners of highways of the towns of Westchester and Eastchester, on or before the first day of September, in every year." (21st Sess., Chapt. 76 ; 2 K. & R. 492.)

In an act, passed April 8th, 1813, authorizing the erection of what is called Macomb's dam across the Harlem River, it is provided that nothing therein contained should be construed to affect, injure, or impair any rights, property or privilege, which might be then vested by law, and subsisting in John B. Coles, or in any other person or persons claiming under him, or in the Harlem River Bridge Company.  (Laws of 1813, p. 237.)  And a similar provision was inserted in the acts of May 9th, 1836, and May 15th, 1837, hereinafter stated.

On the first day of July, 1804, John B. Coles divided his interest and franchises in the toll bridge, into shares; and sold, transferred and conveyed portions of such shares, to different individuals.  From that time, the proprietors of the bridge were usually called the Harlem Bridge Company.  The complainants were the owners by purchase and otherwise, of the shares so originated by Coles, including those he retained.  In his conveyances of the toll bridge shares, Coles reserved to himself the right to erect the dam provided in the act of 1795, and all other rights, except the toll bridge and its appurtenant liberties and franchises.

In 1808, the legislature passed an act incorporating the proprietors of the toll bridge by the name of *The Harlem Bridge*

*Company.* (Private Acts of 1808, p. 66.) There was no distinct evidence that the proprietors applied for, or accepted the charter thus conferred. The complainants proved that the subject was presented to their consideration at a meeting on the 4th of January, 1809, when it was referred to a committee, who reported to another meeting on the 3d of February, 1809, against accepting the charter, and their report was agreed to. In answer to a communication from the State Comptroller in 1834, the proprietors replied that they were not incorporated, and claimed no privileges as a body politic.

In October, 1835, the Attorney General, on the relation of Thomas C. Taylor and others, filed in the supreme court, an information in the nature of a *quo warranto*, against the now complainants and others, then representing and owning the toll bridge or the principal part of it, alleging that the defendants in the information were exercising the privilege and franchise of being a body politic and corporate, by the name of the Harlem Bridge Company ; and also the franchise of having and maintaining a toll bridge over and across the Harlem River, from the city of New York to the town of Westchester, without being legally incorporated, and without being authorized thereto by law. The proprietors of the bridge put in a plea, setting forth their rights under John B. Coles, and the acts of 1790, 1795, 1797 and 1798, before mentioned, recognized by the act of 1813, to have and maintain the toll bridge, and to take the tolls prescribed in the act; and they traversed the using of any of the corporate rights and privileges alleged in the information. There were many issues joined in respect of the toll bridge, and the right to maintain the same, which it is unnecessary to state. The Attorney General did not take issue upon the traverse of the fact, that they used the rights and privileges of a body politic and corporate, but reciting that they disavowed and disclaimed the same, prayed judgment of exclusion. The supreme court in June, 1839, rendered a judgment accordingly, adjudging that they do in no way intermeddle with such liberties, privileges and franchises of being a body politic and corporate, and of acting as such within this state, but that they be altogether excluded from the same.

In support of the objections taken in the answers in this suit, to the complainant's rights, a mass of testimony was taken respecting the situation and condition of their toll bridge, and the opening left therein, and the draw for the passage of vessels. This testimony proved that since 1825, the opening had not been twenty-five feet wide; and it tended to establish that it was not more than twenty or twenty-one feet in width; that the bed of the river was obstructed in the opening, by stones thrown there to support the piers of the bridge, so that vessels could not go through except at high water, and that the draw was not maintained of the requisite width, and that the bridge itself was in a dilapidated condition.

On the 25th of April, 1831, an act of the legislature was passed, entitled "An act to incorporate The New York and Harlaem Rail Road Company," by which that company was incorporated, with power to build and maintain a railway with a single or double track, from any point on the north bounds of Twenty-Third street in the city of New York, to any point on the Harlem River, between the east bounds of the Third Avenue and the west bounds of the Eighth Avenue; to be used with steam, mechanical and animal power, or any or either of them. The act authorized the corporation to enter upon and take all such lands and real estate as might be indispensable for the construction and maintenance of their railway, on making compensation therefor, in the manner prescribed; and to intersect or cross any stream of water, or any street, road or highway, whenever it should be necessary for such construction. (Laws of 1831, Chapt. 263, p. 323.)

Under this act, and within a year from its passage, the Harlem Rail Road was laid out upon the centre of the Fourth Avenue; and by virtue of this and several subsequent statutes, was constructed prior to 1840, with a double track, from the City Hall of the city of New York to the Harlem River, at the northerly termination of the Fourth Avenue, opposite to Morrisania, and about one-fourth of a mile northerly from the Harlem Bridge, which crossed the river at the northerly termination of the Third Avenue: The track of the railway having been

extended from Twenty-Third street, southerly through Fourth Avenue, the Bowery, Broome street and Centre street, to the City Hall.

On the 17th day of April, 1832, the legislature chartered The New York and Albany Rail Road Company, with power to construct a railway betwixt the cities of New York and Albany, commencing on the island of New York where the Fourth Avenue terminates at the Harlem River, and passing through the counties of Westchester, Putnam, Dutchess, Columbia and Rensselaer, and ending on the Hudson River, opposite or near the city of Albany. The company were authorized to construct a single, double, or treble way or road, and to use it with steam, mechanical and animal power, or any or either of them. Also, to enter upon and take such lands and real estate, as might be indispensable for the construction and maintenance of their railway, on making compensation as provided in the statute; and to intersect or cross any stream, road, or highway, that might be necessary for such construction. (Laws of 1832, Chapt. 162, p. 258.)

This act was amended on the ninth of May, 1836. The time for commencing the New York and Albany Rail Road was extended, and the company was authorized, after completing thirty miles of the railway in the county of Westchester, to commence it on the island of New York. The fourth section contained a provision in these words; " and nothing in this act shall be so construed as to infringe such rights and privileges as the Harlem Bridge Company possess, by virtue of any statute of this state ; nor shall any construction be given to this act to confer any rights or privileges on said Harlem Bridge Company, other than it now has." The amendatory act repeated the authority to cross streams and water courses, and excepted the right to cross the Hudson river. (Laws of 1836, Chapt. 268, p. 373.)

The New York and Albany Rail Road Company organized or assumed to organize, under these statutes, and their rail road was laid out in part, commencing at the termination of the Harlem Rail Road, but no part of it was constructed by the former corporation.

On the seventh day of May, 1840, the legislature passed an

act entitled " An act relating to the New York and Harlem Rail Road Company," the two first sections of which are in these words ;

" § 1. The New York and Harlem Rail Road Company are hereby authorized and empowered to construct a rail road with a single or double track through the county of Westchester, commencing at the Harlem river, and extending with one line of road, from thence northwardly to an intersection of the New York and Albany Rail Road Company's line of road, at such point or place as may be mutually agreed upon by the said two companies ; and the right of extending a branch eastwardly to the line of the state of Connecticut, with the view of intersecting a line or lines of rail road from said state of Connecticut, as well as from the state of Massachusetts. But the said New York and Harlem Rail Road Company shall first construct the road to the north line of Westchester county, before constructing any rail road eastwardly to the line of the state of Connecticut. And for that purpose, the said company is authorized to construct a bridge across the Harlem River, in order to connect the New York and Harlem Rail Road, as now constructed, with the road authorized by this act, in such manner that the same shall have a draw not less than forty feet in width, for the free passage of vessels ; and shall not have more than three piers and two abutments in said river, and shall not in any way impair the navigation thereof ; and it shall be within the power of the legislature of this state to incorporate any other companies for the making of any rail roads eastwardly, through the county of Westchester, to the line of the state of Connecticut, notwithstanding the passage of this act.

§ 2. The New York and Harlem Rail Road Company, shall possess all the powers, and be subject to all. the restrictions, that are contained in the several acts, authorizing the construction of the New York and Albany Rail Road ; but nothing in this act contained shall authorize the said rail road company to use any part of the road of the Westchester Turnpike Road Company, . without their consent, unless upon paying the damages sustain- by the said turnpike company by reason thereof, to be ascertain- ed in the manner prescribed in relation to other lands to be used for the said rail road."

Under the authority of these several acts, The Harlem Rail Road Company, immediately after the passage of the act of 1840, proceeded to construct a railway through the county of Westchester, adopting at its southern extremity, the line laid out by the New York and Albany Rail Road Company, commencing on the northeasterly bank of the Harlem River directly opposite the terminus of the original Harlem rail road. The route thus adopted, ran for the first thirty miles, through the centre of Westchester county, and when the bill was filed, the rail road had been completed and was in active operation for about six miles northwardly of the Harlem River, and trains for the conveyance of passengers, passed over it several times each day from the City Hall in New York, across the Harlem River to its northern termination. Besides which it transported freight daily, its whole length. At the time of the hearing, the rail road had been extended and was in like active use, for a distance of about thirty miles from the Harlem River, through the heart of the county of Westchester, and was in rapid progress towards the county of Putnam. When the bill was filed, the number of passengers who crossed the Harlem River daily in the cars of the Harlem rail road, was one hundred and upwards.

The motive power used on the rail road beyond the compact part of the city of New York, was steam; and the passenger cars were of a large and heavy construction, each containing accommodations for fifty or sixty passengers: And it was proved that the complainants bridge was not of sufficient size or strength to admit of the passage over it, of carriages of such weight as the engines and cars of the Rail Road Company. The cars commenced running across the river, about the twenty-first of September, 1841. The company built a depot for their own use, on the Morrisania side of the river, near the end of their bridge.

Prior in time to these events, was the passage of an act by the legislature, on the 15th day of May, 1837, entitled "An act to authorize the building of a private bridge across the Harlem River," which was in these words:

"§ 1. The inhabitants of the town of Westchester, in the county of Westchester, residing in that part of said town which was known and distinguished as Morrisania, on the thirty-first

day of March, in the year of óur Lord one thousand seven hundred and ninety, are hereby authorized to build a free bridge for their private use across the Harlem River, between Harlem and said Morrisania.

§ 2. Such bridge shall be constructed with a draw or slide for the passage of vessels with standing masts, and be so attended as not to obstruct or hinder the free passage of vessels navigating said river.

§ 3. The right herein granted, is to be taken in pursuance of and used in conformity with, the right reserved to the said inhabitants of Morrisania, in the act passed the thirty-first day of March, in the year of our Lord one thousand seven hundred and ninety, granting to Lewis Morris, his heirs and assigns, the right of a toll bridge across said river, entitled, " An act for building a bridge across Harlem River," and not otherwise.

§ 4. The legislature may amend or repeal this act." (Laws of 1837, p. 471.)

Under the authority of this act and the rights contained in the Morrisania patents, Gouverneur Morris and his associates, descendants of the patentee, and being freeholders or inhabitants of Morrisania, immediately erected a large and very substantial covered bridge across the Harlem River, from the northern termination of the Fourth Avenue in the city of New York, to the Westchester side of the river, and connected the bridge on that side by a new road, with the road leading from the complainants bridge into the county of Westchester. The bridge thus constructed, was built upon three stone piers, with two abutments, and had a draw which was forty-six feet wide between the stone piers and forty feet wide between the wood projections, when opened. From the timé of its completion, it was used by the inhabitants of Morrisania, for their transit to and from the city of New York. Gates were erected at the end of the bridge which completely inclosed it, and a person was employed to prevent unauthorized persons from crossing the bridge.

On the tenth day of November, 1840, The New York and Harlem Rail Road Company entered into an agreement under seal, for the purchase of this bridge and the abutments, (if on trial, it proved to be of sufficient strength,) from Lewis Morris,

Gouverneur Morris, Gerard W. Morris, Richard V. Morris, Henry Morris, William H. Morris and Richard L. Morris, who had built and then owned the same; for the price of $30,000, or the cost and interest, if they were less than that sum. The vendors reserving to the inhabitants of Morrisania, all their rights and privileges, which were conferred upon them by the act of May 15, 1837. And on the 17th day of August, 1841, (a trial of its strength proving satisfactory,) the bridge and abutments were conveyed to the rail road company, by the owners above named, reserving such rights and privileges of the inhabitants of Morrisania.

The Rail Road Company laid the track of their rail-way, on the floor of the bridge which had thus been erected by the Messrs· Morris, and it became a part of their rail road from the city of New York into the county of Westchester. The gentlemen who erected the bridge, and the inhabitants of Morrisania in general, continued to make use of the same bridge for their private purposes, as before. The Rail Road Company employed an attendant to prevent the passage of persons not in their employ, nor inhabitants of Morrisania.

In respect of the complainants bridge, it was shown that the Third Avenue which terminated at the bridge, was the great thoroughfare from the city of New York to the county of Westchester, and the adjacent country to the north and east. That the travel which formerly crossed the bridge was very great, especially in vehicles of all kinds; and the bridge was extensively used for foot passengers, and animals led or driven, which were subject to the payment of tolls. That after the rail road commenced running their passenger trains into the county of Westchester, the travel of all descriptions over the complainants bridge, was seriously diminished, and their receipt of tolls reduced about one-third; and the further extension of the rail road, it was supposed, would still farther affect the receipt of tolls at their bridge, and injure the complainants property therein to an irreparable extent. They contended that from the mode of travelling and freighting on the rail road, it was and would be impracticable for the complainants to ascertain with precision, the extent of their loss and damage by means of the rail road company's crossing and using the Morris bridge. They also contended, and gave evidence to

prove, that ever since the construction of that bridge, both the Morris's while they controlled it, and the rail road company after the sale to them, had so negligently or improperly guarded and taken care of that bridge, that it had been constantly made use of by persons on foot, in vehicles, and with animals, who had no right to cross it, and w ho thereby evaded the payment of the tolls which they ought to have paid to the complainants. The testimony on this subject, failed to establish any such negligence or omission on the part of the Messrs. Morris; but it proved that in some instances, the charge against the rail road company in this particular was well founded.

The latter company insisted in their answer, that the complainants were precluded from interfering with the use of the new bridge, because they had raised no objection nor given any warning to the company, although they had looked on and seen the company expending a very large sum of money in constructing the extension of their rail road, which extension, would be utterly useless, without the bridge in question."

*C. B. Moore* and *S. Stevens,* (with whom was *E. Coles;*) for the complainants.

Mr. Moore submitted the following points and authorities:

I. The right granted to L. Morris, his heirs and assigns, by the act of 1790, was an exclusive right to maintain a bridge over Harlem River, and to receive the tolls therein specified, for sixty years.

1. The act by its terms was exclusive.

2. But if it were not so expressed in the act, the grant of tolls necessarily excluded all competition which would diminish the tolls. (*Newburgh Turnpike Co.* v. *Miller,* 5 J. C. R. 101, 106, 112; *Livingston* v. *Van Ingen,* 9 J. R. 568, 573; *Ogden* v. *Gibbons,* 4 J. C. R. 161.)

II. The complainants, as assignees of John B. Coles, the assignee of Lewis Morris, are entitled to the franchise; and all the conditions precedent to the vesting of the exclusive right, were complied with, and have been repeatedly acknowledged by the

legislature to have been complied with. (Acts of 1790, 1795, 1797, 1798, before mentioned. *The People, ex rel. Taylor* v. *Thompson and others,* 21 Wend. 235 ; reversed in the Court of Errors, 23 ibid. 537.)

III. It was not in the power of the legislature after granting that franchise to Morris, to re-grant any part of it to any other person, or make any other grant, or give any other privilege, which would prevent or impair the full enjoyment of the franchise during its continuance. (3 Kent's Com. 458, 9; 2 Bl. Com. 37; *Rex* v. *Cambridge, Vice-Chancellor,* 3 Burr. 1656; *Wales* v. *Stetson,* 2 Mass. R. 146 ; *Crittenden* v. *Wilson,* 5 Cowen, 165.)

It is no excuse or justification for the erection of a new bridge or ferry, which interferes with one previously granted, that it was erected by the King's license. (Hardres. Rep. 163; *Rex* v. *Sir Oliver Butler,* 3 Lev. 221 ; *S. C.* 2 Ventris, 344 ; *Yard* v. *Ford,* 2 Saunder's Rep. 172 ; 2 Institutes, 406.)

The act granting the franchise, the acceptance by Lewis Morris and his assignee, John B. Coles, the undertaking to comply with its terms, and in this case the actual building the bridge, and thereby the payment of a valuable consideration, constituted a contract, which by the Constitution of the United States, the legislature could not, directly nor indirectly impair; and which would be infringed by the grant of a franchise to compete with it. (6 Cranch, 87 ; 7 ibid. 164 ; 9 ibid. 49 ; *Dartmouth College* v. *Woodward,* 4 Wheaton, 516 ; *Green* v. *Biddle,* 8 ibid. 84 ; *Wyman* v. *Southard,* 8 ibid. 50.)

IV. The exception to the exclusive grant to Lewis Morris, in the act of 1790, did not authorize the inhabitants of Harlem and Morrisania to build a bridge across Harlem River for any purpose.

V. But if the exception permitted the legislature to pass the act of 15th May, 1837, authorizing the inhabitants of that part of the town of Westchester, which in 1790 was called Morrisania, to build a free bridge for their own private use, the legislature had not the power to authorize any other ferry or bridge over the river, for any purpose whatever.

VI. The act of 1837, does not authorize a bridge to be erected

Thompson v. The N. Y. and Harlem Rail Road Company.

for sale, nor for any purpose but the exclusive private use of the inhabitants of Morrisania. No purchaser of it can appropriate it, or suffer it to be appropriated to any other use. The Rail Road Company, therefore, have acquired no title to the new bridge, and have no right to use, or suffer it to be used for any purpose, unless it be the exclusive private use of the inhabitants of Morrisania.

VII. The act of 7th May, 1840, (Laws of 1840, p. 190,) authorizing the Rail Road Company to build a bridge across the river, is a violation of the franchise vested in the complainants, and as against them is entirely nugatory.

VIII. The erection and use of the new bridge by the defendants, so near and creating so injurious a competition to the bridge of the complainants, affording facilities to every traveller to shun the complainant's bridge, which he would otherwise pass; is in respect to the complainant's franchise, a *nuisance ;* and this court will grant a perpetual injunction to secure the enjoyment of the complainant's franchise. (*Newburgh Turnpike Co.* v. *Miller*, 5 J. C. R. 101.)

IX. The objection, that the complainants can only obtain redress by action of debt before a justice, cannot prevail.

The Rail Road Company being a corporation, cannot be sued before a justice.

The right to sue before a justice for treble toll, was given as a cumulative remedy; is of a penal character ; and no other remedies are excluded by it. (*Crittenden* v. *Wilson*, 5 Cowen, 165.)

X. The remedy at law is altogether inadequate and inappropriate ; and the necessity of resorting to this court, quite palpable. It cannot decline jurisdiction.

XI. The act of incorporation of 1808, has nothing to do with the matter. It was not accepted, nor acted under ; was always disclaimed, and there is a judgment of preclusion against any possible right under it.

XII. The objections relative to the width of the opening of the draw, the depth of water in the draw, and the detention of vessels, are of no avail.

(*a*) They seek to establish a forfeiture of rights once duly vested, and founded upon a valuable consideration ; and such

forfeiture cannot be set up and tried in this collateral way. (23 Wend. 579, 585, *Thompson* v. *The People*, before cited.)

(*b*) They relate to the navigation of the river, with which the defendants, as owners of the other bridge, have no concern.

(*c*) They are not set up in the answers in such manner, as to be entitled to much consideration.

(*d*) They are not sufficient in themselves to justify the entire destruction of complainant's rights and privileges, or the withholding of the relief they seek.

(Authorities on this point, Com. Dig., Franchise, G. 3 ; 23 Wend. 193 ; 5 Mass. 230 ; 6 Cow. 23 ; 8 Wend. 645 ; 23 ibid. 255 ; 5 J. C. R. 101 ; 23 Wend. 222 ; 23 ibid. 537.)

XIII. The complainants are entitled to an account against the defendants for the loss of toll, and to costs.

Mr. *Stevens*, in reply, also referred to opinions of McLean, J., (11 Peters, 588, 647 ;) Story, J., (pp. 603, 616, 7, 646, 7 ;) and Thompson, J., in *S. C.* ; also 11 Peters, 568, 9, 637, 638, 641, 608, 546, 7, 623, 624 ; *Beatty* v. *Knowles, Lessee,* (4 Peters, 168 ;) *Providence Bank* v. *Pitman,* (4 ibid. 514 ;) 21 Wend. 235 ; 23 ibid. 537 ; 9 ibid. 351 ; 8 ibid. 645 ; Ang. & Ames on Corp. 507, 8 ; 3 Kent's Com. 459 ; 5 Price, 473 ; 15 Wend. 267 ; 18 ibid. 1.

*C. W. Sandford* and *B. F. Butler,* for the New York and Harlem Rail Road Company, argued the following points :

I. The complainants are not the assignees of Lewis Morris, and if they are such assignees, they have no title to maintain the bill in this cause.

(Under this point, reference is made to the points in behalf of Messrs. Morris.)

II. The New York and Harlem Rail Road Company, whether their purchase of the new bridge by the indenture of the 17th August, 1841, was authorized by the act of the legislature or not, do not, by their use of said bridge, violate, infringe or interfere with the franchise granted to Lewis Morris by the act of the 31st of March, 1790 ; and the complainants, admitting them to be the assignees of Lewis Morris, and admitting also that the

franchise granted to him is yet in existence, have no title as against the Rail Road Company, to the relief sought by the bill.

1. The franchise granted by the act of 1790, was merely that of erecting and maintaining an ordinary bridge, in connection with a common highway, adapted to the passage of vehicles, horses, cattle, and foot passengers, in the manner and according to the usage of that day.

The franchise of erecting and maintaining a bridge as part of a rail road, was neither granted, contemplated nor foreseen, at the time of the passage of that act.

2. The bridge of the New York and Harlem Rail Road Company being used by them as a part of their rail road for the passage of their cars, and for that purpose exclusively, is not an interference with the franchise of the complainants. The cars of the company are neither pleasure carriages, wagons, nor carts, within the meaning of the act of 1790; nor are the passengers conveyed in such cars, such passengers as are intended by that act. (*Lansing* v. *Smith*, 8 Cowen, 146; *S. C.* in Error, 4 Wend. 9.)

III. The use of said bridge, under and by means of the indenture of 17th August, 1841, is agreeable to and authorized by the act of the 7th May, 1840, empowering the Rail Road Company to construct a bridge across the Harlem River; and even if otherwise, it is not for the complainants to interfere.

1. This bridge was lawfully erected by the inhabitants of Morrisania, under the act of the 15th May, 1837; which act was fairly within the exception contained in the act of 1790, and therefore constitutional and valid. (*Charles River Bridge* v. *Warren Bridge*, 11 Peters, 420, 546 to 553, opinion of Taney Ch. J.; *Cayuga Bridge Company* v. *Magee*, 2 Paige, 116; *S. C.,* 6 Wend. 85; *Mohawk Bridge Co.* v. *Utica and Schenectady R. R. Co.*, 6 Paige, 564.)

2. The bridge being lawfully in existence at the place in question, it was not only competent for the Rail Road Company to contract for its use, as a part of their rail road, but such contract was in furtherance of the interest of the public and the intent of the legislature; because less injurious to the navigation

than the erection of a new bridge. (Acts of 1831, 1832, 1836, 1837, 1840, before mentioned. *People* v. *Rensselaer and Saratoga R. R. Co.*, 15 Wend. 129, 130.)

3. The purchase of the bridge, is a substantial compliance with the provisions of the act. And if not, it is for the state, and not for the complainants, to take advantage of the defect. (*Thompson* v. *The People*, 23 Wend. 537; Francis's Maxims, 62 to 71; 8 Wend. 645; 1 Paige, 102; 4 ibid. 481; 9 Wend. 351, 381; 4 Gill & Johns. 1; 3 Stark. Ev. 1249.)

IV. The act of 7 May, 1840, was a constitutional and valid law.

1. It does not in any way, violate, infringe or interfere with the franchise of the complainants, nor injuriously affect its value.

2. If the value of complainants franchise be impaired by the law of 1840, still this does not impair the obligation of the contract made by the state with Lewis Morris; because there is nothing in that contract to deprive the people of this state, of the benefits of the new system of intercommunication introduced by the invention of rail roads, nor to forbid the passage of a law authorizing the construction of a rail road bridge at the place in question. (11 Peters, 420.)

3. It was not in the power of the legislature of 1790, to make a contract which should have the effect of taking from their successors, the right of opening any such new methods and channels of communication, as such successors might deem essential to the comfort, convenience and prosperity of the people. (*Britton* v. *Mayor, &c. of New York*, Ms. in Supreme Court; and the cases cited on Mr. Rutherfurd's points.)

V. The complainants having silently stood by, and permitted the rail road company to expend large sums of money in constructing their road in the county of Westchester and in connecting it with the bridge in question, are estopped from now asking the interposition of a court of equity. (*Storrs* v. *Barker*, 6 J. C. R. 166; 1 Story's Eq. Jur. 375, 379, § 385, 390.)

*W. Rutherfurd* and *Geo. Wood*, for the defendant, Gouverneur Morris.

Mr. Rutherfurd argued upon the following points.

I. The remedy prayed for by the bill of complaint in this cause, is not the proper remedy, and the court of chancery has no jurisdiction.

(Eden on Inj. 304; *Livingston* v. *Van Ingen,* 9 Johns. 585, per Kent, C. J; *Hart* v. *Mayor of Albany,* 3 Paige, 213; *S. C.* in the Court of Errors, 9 Wend. 570; *Bronson* v. *Kinzie,* 1 Howard, 311; *McLaren* v. *Pennington,* 1 Paige, 102; *Livingston* v. *Tompkins,* 4 J. C. R. 431; *Cayuga Bridge Co.* v. *Magee,* 2 Paige, 166; *Sprague* v. *Birdsall,* 2 Cowen, 419; *Sharpe* v. *Spicer,* 4 Hill; 3 Kent, 459, 5 Ed.; Castle's case, Cro. James, 646; *Stevens* v. *Watson,* 1 Salk. 45; 2 Salk. 460; 1 Saunders 135, note, cases therein cited; *Rex* v. *Robinson,* 2 Burr. 799; 3 Burr. 1707; *Miller* v. *Taylor,* 4 Burr, 2303; Dwarris on Statutes, 33; *Almy* v. *Harris,* 5 Johns. 174; *Clark* v. *Brown,* 18 Wend. 220; *Stafford* v. *Ingersoll,* 3 Hill, 41; *Calkins* v. *Baldwin,* 4 Wend. 667; *Bailey* v. *Mayor of New York,* 3 Hill, 538; 1 Kent, 467, 5 Ed.; Cases cited in *Livingston* v. *Van Ingen,* 9 Johns. 506, 507; *Croton Turnpike Co.* v. *Ryder,* 1 J. C. R. 611; *Attorney General.* v. *Utica Insurance Co.,* 2 J. C. R. 371; *Newburgh Turnpike Co.* v. *Miller,* 5 ibid. 101; *Gibbons* v. *Ogden,* 17 Johns. 488; 18 Wend. 220; Gregory's Case, 6 Coke Rep. 20; *Rex* v. *Buck,* 1 Strange, 679; *The King* v. *Stevenson,* 2 East 362; Dwarris on Statutes, 34, 86, 77; *Parsons* v. *Barnard,* 7 Johns. 144; *Gibson* v. *Woodworth,* 8 Paige, 132; Acts of 1790, 1795, 1797, 1798, 1808. That the act of 1790, was unconstitutional, see *Presb. Church* v. *City of New York,* 5 Cowen, 538; *Stuyvesant* v. *The Mayor, &c. of N. Y.,* 7 Cowen, 605; Opinion of Taney, now C. J.; Camden & Amboy R. R. Case, Niles Register, Nov. 2d, 1833; *Mayor, &c. of New York* ads. *Britton,* the Street Sweeping contract, per Nelson, Ch. J.; 23 Wend. 205, 206; Opinion of Verplank & Edwards, 23 ibid. 599; *Kearsey* v. *Pruyn,* 7 Johns. 179; *Stratton* v. *Herrick,* 9 Johns. 356; *Griffin* v. *Horne,* 18 Johns. 357; Angell & Ames on Corp. 145; *New York Fire Ins. Co.* v. *Ely,* 5 Cowen, 568; *Gallini* v. *Laborie,* 11 East, 180; *The Newburgh Water Power Case,* 2 J. C. R.; 7 New Hampshire Rep. 66.) As to the remedy see further, *Semple* v. *London and*

*Birmingham Rail Road Co.*, 1 Railway Cases, 133; *Great Western R. R. Co.* v. *Tapster*, 2 ibid. 591.

II. The proper parties complainants, are not before the court.

1st. Because John B. Coles expressly reserved this franchise to himself and his heirs. (*Nicol* v. *Trustees of Huntington*, 1 J. C. R. 166; a particular specification will exclude things not specified; *Grant* v. *Chase*, 17 Mass. Rep. 443; *West Boston Bridge* v. *County Commissioners*, 10 Pick. 272.)

II. Because the complainants are an incorporation, incorporated under an act of the legislature of 1808.

(*Charles River Bridge* v. *Warren Bridge*, 7 Pick. 344; *Riddle* v. *Proprietors of Locks on Merrimack River*, 7 Mass. 187; *Bank of U. S.* v. *Dandridge*, 12 Wheat. 71; *Russell* v. *McClellan*, 14 Pick. 53; *Rex* v. *Basey*, 4 M. &. S. 255; Angell & Ames on Corp. 55.)

III. The Morris's are not the owners of the new bridge, and therefore not liable. (3 Kent, 5 Ed. Lecture 53; *Bloodgood* v. *Mohawk and Hudson R. R. Co.*, 18 Wend. 42; Act of 1837; Act of 1840; *Steel* v. *Western Inland Lock navigation Co.*, 2 Johns. 286; *Case* v. *Thompson*, 6 Wend. 634; *Rogers* v. *Bradshaw*, 20 Johns. 738.)

IV. That the new bridge, being used for a purpose not known of by the legislature, at the time the act of 1790, was passed, and not directly conflicting with the franchise therein granted, the owners are not liable.

(Dwarris on Statutes, Tit. Construction; *Charles River Bridge Case*, 11 Peters, 420; *Dyer* v. *Tuscaloosa Bridge*, 2 Porter's Alab. Rep. 296; *Tucahoe Canal Co.* v. *Tucahoe Rail Road*, 11 Leigh, 42; *Cayuga Bridge Co.* v. *Magee*, 2 Paige, 116; *Sprague* v. *Birdsall*, 2 Cowen, 419; *Mohawk Bridge Co.* v. *Utica & Schenectady R. R. Co.*, 6 Paige, 554; 3 Kent, 459, 5 Ed.; *Rogers* v. *Bradshaw*, 20 Johns. 735; *United States* v. *Kimball*, Law Reporter for May, 1844, per Judge Sprague, confirmed by Judge Story; also S. P. by Judge Conkling; *Rex* v. *Handy*, 6 T. R. 286.)

V. The complainants having allowed the Harlem R. R. Company to expend a large sum of money, without objection, under

the act of 1840, are estopped from setting up a claim for damages.

(*Earl of Ripon* v. *Hobart*, 3 Mylne and Keen, 169 ; *Birmingham Canal Co.* v. *Loyd*, 18 Ves. 515 ; 6 Paige, 554, 563 ; *Scudder* v. *Trenton and Delaware Falls Co.*, Saxton's Ch. R. 694, N. J. ; *Reid* v. *Gifford*, 6 J. C. R. 19 ; *Storms* v. *Mann*, 4 ibid. 26 ; *Pillsworth* v. *Hopton*, 6 Vesey, 51 ; *Van Bergen* v. *Van Bergen*, 3 J. C. R. 287 ; *Greenhaff* v. *Manchester and Birmingham Rail Road Co.*, 1 Railw. Cases, 68 ; *Illingworth* v. *Manchester and Leeds Rail Road Co.*, 2 ibid. 209.)

VI. The evidence shows that the bridge has been only used by the cars belonging to the Harlem Rail Road Company, and the inhabitants of Morrisania.

VII. That the inhabitants within the limits of Harlem, as it was in 1790, are entitled to cross said bridge. (See Old Harlem Patent.)

VIII. There is no equity in the bill. (4 Bacon's Abrid. p. 154, Title, Franchise ; 3 Black. Com. 219 ; *Yard* v. *Ford*, 2 Saund. 172 ; *Blissett* v. *Hart*, Willes, 512; *Tripp* v. *Frank*, 4 T. R. 666 ; Eden on Inj. 271 ; *Lessees of the Dean and Chapter of Durham*, 1 Ves. Sen. 476 ; *Prince* v. *Lewis*, 5 Barn. & Cress. 363 ; *The King* v. *Pease*, 4 Barn. & Adolph. 17 ; *Boston Water Power Co.* v. *The Boston and Worcester Rail Road Corporation*, 23 Pick. 360.)

There is no instance of the court holding a nuisance without a trial. (18 Ves. 220 ; New York Legal Observer, May, 1845, p. 26 ; *Bonaparte* v. *Camden and Amboy R. R. Co.*, 1 Bald. C. C. R. 205.)

*G. W. Morris*, in person, and for Richard V. Morris, William H. Morris, Henry Morris and Richard L. Morris, argued upon the following points :

I. The remedy prayed for in the bill of complaint in this cause is not the proper remedy, and the court of chancery has no jurisdiction. (*Eckford* v. *Hood*, 7 T. R. 620 ; *Hinsdale* v. *Larned*, 16 Mass. 65 ; *Almy* v. *Harris*, 5 Johns. 175 ; 6 Paige,

565; 3 ibid. 213; 9 Wend. 570; 18 Ves. 515; 1 Metcalf, 216; 3 Bl. Com. 437; 3 Woodd. Lect. 83; Jacob's Law Dict. Tit. Account.)

II. The proper parties, complainants, are not before the court.

1. Because John B. Coles expressly reserved this franchise to himself and his heirs—his heirs must sue.

2. Because the complainants are an incorporation, incorporated under an act of the legislature in 1808.

III. That the Morris's are not the owners of the new bridge, and are therefore not liable. (*People* v. *Rensselaer and Saratoga R. R. Co.*, 15 Wend. 114.)

IV. That the new bridge being used for a purpose not known of by the legislature at the time the act of 1790 was passed, and not directly conflicting with the franchise therein granted, the owners are not liable. (Charles River Bridge Case, 11 Peters R. ——.)

V. The complainants having allowed the Harlem Rail Road Company to expend a large sum of money without objection, under the act of 1840, are estopped from setting up a claim for damages.

VI. The evidence shows, that the bridge has been only used by the cars belonging to the Harlem Rail Road Company, and the inhabitants of Morrisania.

VII. That the inhabitants within the limits of Harlem, as it was in 1790, are entitled to cross said bridge.

VIII. There is no equity in the bill.

*H. M. Morris*, for the defendant Lewis Morris, relied on the points made by Messrs. Rutherfurd and G. W. Morris.

THE ASSISTANT VICE-CHANCELLOR.—All the defendants concur in making various objections to the complainant's right to maintain this suit, and I will first examine those objections without stopping to inquire which of the defendants has omitted to pave the way for them in his answer.

*First.* It is said that John B. Coles reserved the bridge franchise in his conveyance to the trustees, in 1804.

The fact is clearly otherwise. The franchise reserved, was that of erecting and maintaining a dam, which the supreme court

held, in the *quo warranto* case hereafter referred to, was entirely distinct from the erection of a bridge. And the whole object of the grant, was to convey the right to the bridge and the tolls.

*Second.* In 1808, the legislature passed an act incorporating the then owners of the Harlem Bridge, and it is insisted that the corporation alone can file a bill in respect of the franchises in question. The burthen of establishing the acceptance of the charter is upon the defendants, and the proof falls far short of making it out. This is sufficient to dispose of the point, but if the testimony were much stronger to prove the acceptance of the charter, I think that the judgment in the suit of the People, would be decisive in the complainants favor. The People, on the relation of Thomas C. Taylor and others, in 1836 filed an information, alleging amongst other things, that these complainants were exercising the franchise of being a body politic and corporate by the name of the Harlem Bridge Company, having usurped the same, and calling on them to show by what warrant they claimed to use and exercise such franchise. In their plea to the information, the now complainants alleged that they never used the franchise of a corporation. Upon this, the Attorney General, in behalf of the people took judgment of preclusion. These proceedings, while they preclude the complainants and the state from setting up that the former are a body corporate, ought certainly to prevent strangers from insisting the contrary, in a case where the question arises collaterally.

*Third.* The next objection led to the taking of considerable testimony. It is, that the complainants, and those preceding them in the ownership of the bridge, never complied with the conditions and requirements which formed the consideration of the several acts of the legislature ; and that, if there were a sufficient compliance originally, they have forfeited their right to maintain their franchise, by neglecting for a long time to keep up the bridge and its appurtenances, pursuant to the terms of those acts.

The supreme court decided, in the *quo warranto* case before mentioned, that the act of 1795 modified the provisions of the act of 1790, in respect of the width of the Harlem Bridge, and that the privilege of erecting a dam, was an additional grant,

which John B. Coles might either exercise or omit, without affecting his right to build the bridge. The court therefore held, that Coles had complied with the conditions of the grant contained in the acts authorizing the bridge, by the erection of one only twenty-four feet wide, although it did not rest on a stone dam, or foundation. It appears that the opening for vessels and the draw over the same, were originally made of the size prescribed by the act of 1790, and that John B. Coles executed a bond, in conformity to the sixth section of the act of 1795.

I have no doubt, therefore, that the conditions annexed to the franchise in the acts granting the same, were substantially performed by Coles and his associates, and that they became duly invested with the rights and privileges conferred by those acts.

Before investigating the grounds upon which it is alleged that the owners of the bridge have forfeited their franchise, I am met with a preliminary inquiry. Can these defendants be permitted to set up such forfeiture in answer to this suit?

Admitting for the sake of the argument, that the bridge as now maintained, is a public nuisance on account of its obstruction of the navigation, it is of no avail to the defendants, unless they can show that they are specially injured thereby. Now, it is not pretended that the closing of the opening and draw entirely, would affect the defendants at all. As a nuisance therefore, they are not in a position to complain of the bridge in a civil suit.

The ground taken by the defendants here, is not analogous to setting up, by way of defence to an action for tolls, by a turnpike or bridge company, that the turnpike or bridge is out of repair. Such a defence, while it shows that the company is not entitled to recover the tolls, does not interfere with the company's title to its franchise; and in a suit for tolls subsequently due, a judgment against the company in a former suit, would not prevent a recovery. The defendant would be compelled to prove a defence, as if no former suit had existed.

It cannot be shown in defence to the suit of a corporation, that the plaintiff's have forfeited their corporate rights by misuser or by non-user.

Advantage can be taken of such forfeiture, only on process on behalf of the state, instituted directly against the corporation, for

the purpose of avoiding the charter or act of incorporation; and individuals cannot avail themselves of it in collateral suits, until it be judicially declared. (Angell & Ames on Corporations, 507 ; 2d Ed., and the numerous cases there cited. *Trustees of Vernon Society* v. *Hills*, 6 Cowen, 23 ; *Bank of Niagara* v. *Johnson*, 8 Wend. 645.)

The grants to Lewis Morris and John B. Coles by the legislature, were as much a franchise as is the power to act as a body corporate ; and must be forfeited judicially, before individuals can avail themselves of any misuser or omission to keep up their bridge in the manner prescribed by law. As to the nature of the grant, if any reference be necessary, see 3 Kent's Comm. 458, and *Thompson* v. *The People*, (23 Wend. 579, 580, 596, per Verplanck, Senator.)

It is therefore foreign to this case, to examine the alleged omissions of the complainants to keep up their bridge, and the opening and draw in the same, in the manner required by the acts authorizing its erection.

*Fourth.* It is insisted by some of the defendants, that the complainants, if they have any remedy, are restricted to the action of debt given by the second section of the act of 1790, against the owners of any bridge or vessel interfering with the enjoyment of their franchise.

One answer to this is, that the owners of the obnoxious bridge being a body corporate, no suit could be maintained against them in a justice's court at the time this cause was commenced.

The case of *Livingston and Fulton* v. *Van Ingen and others*, (9 Johns. 507, 562, 569, &c. 585, &c.) decides that the parties in possession of an exclusive right or privilege granted by a statute, are entitled to an injunction to restrain others from infringing that right, although the statute imposed various forfeitures on persons so offending.

This principle is sufficient to sustain the bill in its chief object, if the right claimed by it be found to exist in the complainants ; and as it may prove unnecessary to pursue the inquiry in respect of the claim made for an account, I will waive it for the present.

The other reasons assigned for the objection of want of equity

in the bill, will be examined hereafter, if there remain any necessity for looking into them, after disposing of the more important points in the cause.

Next, as to the right of Lewis Morris, Gouverneur Morris and others, to erect the bridge which is the subject of complaint.

This is abundantly established by the grant in the Morrisania patents of 1676 and 1697, the express reservation in the act of 1790, authorizing the bridge of the complainants, and the statute passed May 15, 1837, enacting that the inhabitants of Morrisania might build a free bridge for their private use across the Harlem River, between Harlem and Morrisania.

Indeed, this right is not seriously disputed by the complainants, although they contend that the expensive bridge which was erected by the Morris's, was really intended for the use to which it has been subsequently appropriated. As to this, without noticing its materiality, it suffices to say that whatever those gentlemen might have *hoped*, they could not have relied upon transferring it to the Harlem Rail Road Company, for that corporation was not then empowered to cross the Harlem River.

I have now come to the grave and very important question, presented by the pleadings, viz., the right of the Harlem Rail Road Company, to purchase the bridge built by the Messrs. Morris's and to use it for the purposes of their railway.

The charter of this company, passed in 1831, authorized it to construct a rail road from Twenty-third street in the city of New York to the Harlem River, at any point between the Third and Eighth Avenues. (Laws of 1831, Ch. 263, p. 323.) The rail road was laid out upon the line of the Fourth Avenue, and prior to 1840, was finished and in active operation from the City Hall to the termination of the Fourth Avenue, at the southerly side of the Harlem River, directly at the point where the Morrisania bridge crossed the river.

In 1832, the New York and Albany Rail Road Company was incorporated, authorizing a railway from the city of New York (commencing where the Fourth Avenue terminates at the Harlem River,) to the city of Albany. (Laws of 1832, Ch. 162, p. 258.)

In 1836, this charter was amended, and the company empow-

ered to extend their rail road into the city of New York; but nothing in the act was to be so construed as to infringe such rights and privileges as the Harlem Bridge Company possessed by virtue of any statute. The act authorized the company to construct their road across any streams which it might intersect, except the Hudson River. (Laws of 1836, Ch. 268, p. 373.) The same power was conferred by the original act of incorporation in 1832.

On the 7th of May, 1840, an act was passed, which authorized the Harlem Rail Road Company to construct a rail road through the county of Westchester, commencing at the Harlem River, and extending northwardly to meet the New York and Albany Rail Road Company, with a branch to the line of the state of Connecticut. The act authorized the Harlem Rail Road Company to construct a bridge across Harlem River, in order to connect their road as then built, with the extension permitted by that act. The second section provided that the company should possess all the powers, and be subject to all the restrictions, that are contained in the several acts authorizing the construction of The New York and Albany Rail Road Company, and prohibited them from using any part of the road of the Westchester Turnpike Company, except upon making compensation. (Laws of 1840, Ch. 242, p. 190.) Aside from the principal question involved, it is contended that inasmuch as the inhabitants of Morrisania could build a bridge for no other purpose than for their exclusive private use, they could not erect one for sale: No purchaser could acquire a right to appropriate the bridge when built, to any other use than that of those inhabitants : Therefore the Harlem Rail Road Company have acquired no title to the bridge by their purchase from the Morris's, and have no right to use it or to suffer it to be used, for any purpose except the private use of the inhabitants of Morrisania.

This argument might be indisputable if it were applied to an ordinary purchaser, or to a corporation having no authority to carry a rail road over the Harlem River. But these defendants were expressly authorized to cross the river with their railway in order to connect it as then built, with the Westchester extension.

They were also empowered to purchase any lands or real estate, which were necessary for the construction of their road, and if the owners were unwilling to sell, the company could take such lands, on making compensation in the mode pointed out by the charter.

The bridge of the Morris's stood at the very spot where the defendants were required by the act of 1840, to cross the river to continue their rail road. Its materials and superstructure were the private property of the Morris's, although subject to the private use of the other inhabitants of Morrisania. The company had an undoubted right to take the bridge, whether the Morris's were willing or not, on making to them compensation for its value, and making a suitable provision for the use of it by them and the other inhabitants entitled to its benefit. Under these circumstances, it appears to me that nothing can be plainer than that the company had a perfect right to buy the bridge for the use of their rail road.

So far as the navigation of the river was concerned, it was far better for the public interest that there should be but one bridge, for the use of both the rail road and the inhabitants of Morrisania; and in respect of the complainants, it was no worse for them, but rather the contrary, because the use of the bridge by the railroad, would unavoidably interfere with its free and unrestricted use by the ordinary travel of the country.

The complainants insist further, that the act of 1840, authorizing the Harlem Rail Road Company to build a bridge across the river, is a violation of the franchise vested in them, and as against them, is entirely nugatory. They do not deny the power of the legislature to authorize the company to build such a bridge, but they contend that the legislature itself could authorize it, only upon making proper compensation to them for the consequent injury to their franchise.

These positions were very ably and earnestly argued by the learned counsel for the complainants; but in the present state of the law on the subject, as established in this court, it would be quite superfluous for me to enter into an elaborate discussion of the momentous principles involved in its consideration, or to examine critically the force, extent and authority of the leading

case relied on by the defendants.    (*Charles River Bridge* v. *Warren Bridge*, 11 Peters, 420.)

In *The Mohawk Bridge Company* v. *The Utica and Sche-nectady Rail Road Company*, (6 Paige, 554,) the complainant's charter prohibited others from establishing a ferry within one mile from their toll bridge.   The defendants were authorized to construct a railway from Schenectady to Utica, which gave them the right to build a bridge across the Mohawk River for the pas-sage of their engines and cars, and they commenced building it about a hundred rods distant from the plaintiff's bridge.   The latter thereupon applied for an injunction, alleging amongst other grounds, that the rail road would divert the travel from their toll bridge, and thus interfere injuriously with the exclusive privi-lege secured to them by their charter.   The chancellor declared his opinion, that the charter of the Mohawk Bridge Company did not deprive a future legislature of the right to authorize the erection of another bridge within the prescribed limits, when-ever the public good should appear to require it ; much less was the legislature deprived of the power to provide for the convey-ance of freight or passengers from one part of the state to another, by an improvement which was entirely unknown at the time when the grant to the bridge company was made.   And if that grant had in terms, given to the corporation the exclusive right of erecting a toll bridge across the river at Schenectady, this sub-sequent grant to the rail road company to cross the river with their railway from Schenectady to Utica, and to transport pas-sengers thereon in the course of their business in the conveyance of travellers from one place to another, would not have been an infringement of the privileges conferred by such prior grant ; as the rail road bridge would not be a toll bridge, within the intent and meaning of the grant to the first company.   The motion for the injunction was denied on another ground, but it is evident that the chancellor would have denied it for the reasons just sta-ted, if no other had existed.

More recently, in the case of *The Oswego Falls Bridge Co.* v. *Fish and others,* decided May 25th, 1846,(*a*) the bill was filed

---

(*a*) Now reported in 1 Barb. Ch. R. 547.

to restrain the defendants from erecting a free bridge across the Oswego River, between the falls and the north line of the village of Fulton, which they were authorized to do as commissioners, by an act of the legislature passed in 1838. (Laws of 1838, Chapt. 254, p. 240.) The complainants toll bridge across the Oswego River, terminated about the centre of the village of Fulton, and the defendants had laid out the free bridge so that it would terminate within the village, near to the toll bridge. The act authorized the commissioners to purchase and repair the Oswego Falls bridge, instead of building a new bridge, if in their opinion, the public interest would be best promoted thereby. The charter of the Oswego Falls Bridge Company, (Laws of 1824, ch. 293, p. 351,) authorized them to erect a bridge over the Oswego River, and to receive tolls in the usual manner. Vice Chancellor Gridley of the fifth circuit, dismissed the bill. The complainants appealed, and the chancellor affirmed the decree. In his decision, he says, " The only question, therefore, is whether the legislature had the right to authorize the erection of a free bridge across the Oswego River, so near to the bridge which the complainants had erected under their charter, as to diminish their tolls and materially impair the profits of the company. I had occasion to consider the power of the legislature in this respect, incidentally, in the case of *The Mohawk Bridge Co.* v. *The Utica and Schenectady R. R. Co.*, (6 Paige's Rep. 554,) and I then came to the conclusion that the grant to a corporation to erect a toll bridge across a river, without any restriction of the power of the legislature to grant a similar privilege to others, would not deprive a future legislature of the power to authorize the erection of another bridge, which would divert a portion of the travel from the bridge which had been previously erected. Since that decision, we have been furnished with the reported case of the *Charles River Bridge Co.* v. *The Proprietors of the Warren Bridge*, (11 Peter's R. 420,) decided by the supreme court of the United States, a few months before. That case cannot be distinguished in principle from the present; and as the question was fully considered there, in the very able opinion of Chief Justice Taney, who delivered the judgment of the court, it would be useless to go over the same ground." The same

point apparently, was decided by the Chancellor, in the case of *Meads, Receiver &c.* v. *Wardell*, April 2, 1844, (4th Barbour's Notes of Chancellor's Decisions, p. 14,) where the exclusive right was set up in respect of a ferry.

The second section of the act of 1790 for building the Harlem bridge, provides, that it shall not be lawful for any person or persons whatsoever, to erect any other bridge over or across the Harlem River to Morrisania, or to keep any vessel to ferry any person across the river from Morrisania to Harlem, except for the private use of the inhabitants of those townships. And the complainants insist, (to repeat their point,) that this is a grant and covenant on the part of the legislature, that it will not permit any person except those inhabitants, to erect any bridge or ferry, and those could erect one for their private use only. That the grant was by its terms exclusive, and if it were not so expressed, the grant of tolls necessarily excluded all competition which would diminish the tolls ; and it was not in the power of the legislature, afterwards to make a grant which would impair the full enjoyment of the franchise conferred on the bridge, and any such grant would be void under the constitution of the United States, as impairing the obligation of the contract made by the state with the Harlem Bridge Company.

As to these positions of the complainants, the *Charles River Bridge* case, with that of the *Stourbridge Canal Company* v. *Whaley*, (2 Barn. & Ad. 792,) is decisive against any implication of an exclusive right, when the charter is silent on the subject ; and the decisions of the chancellor to which I have referred, appear to me to be equally conclusive against any restriction of the power of the legislature to charter a new toll bridge, or to authorize a free bridge, in competition with that allowed across the Harlem River by the act of 1790. Other cases to the same effect, will be noticed hereafter. The act of 1790 does not declare that the legislature will not permit another bridge to be erected. Indeed, the declaration inserted in the second section, -was evidently aimed at the rights which it was supposed the inhabitants of Morrisania and Harlem might claim under their old patents, rather than against any interference by others with the franchise granted to the bridge company. As to all persons,

other than the inhabitants of Morrisania and Harlem, such a provision was wholly unnecessary, because no one could set up a toll bridge or ferry, without authority from the state.

The case of *The Newburgh Turnpike Co.* v. *Miller*, (5 J. C. R. 101,) cited by the complainants, does not conflict with these views. There, individuals without the sanction of law, laid out a road and built a bridge, the manifest effect of which was to enable travellers to evade the complainants bridge and toll gate; and the chancellor restrained them by injunction.

It was argued on the part of the defendants, that the rail road bridge, used merely for its appropriate purpose of passing their locomotive engines and trains of cars across the Harlem River, on their way from the city of New York to their various stopping places in Westchester county; does not violate, infringe, or interfere with, the franchise granted to the Harlem Bridge Company by the act of 1790. There is undoubtedly much force in this argument. The rail road bridge, *as such*, is incapable of being used for the passage of any vehicle, animal, or foot passenger, for whose passage the complainants are entitled to receive toll. The fact that the rail road bridge, *as built for the private use of the inhabitants of Morrisania*, may be crossed by such vehicles, &c., does not affect the consideration of this point.

On the other hand, the complainants bridge has not the capacity to pass over the Harlem River, any of the Rail Road Company's engines, or their trains or cars drawn by such engines. And if the complainants were to lay down a suitable railway track, and strengthen their bridge so that the engines and trains of the defendants might cross it, there is nothing in their charter which would warrant them in exacting toll from the defendants. (*Stourbridge Canal Co.* v. *Whaley*, above cited.) This demonstrates that the franchise granted to the defendants, is not the same as that vested in the complainants; nor is there such a similarity between them as renders the one an interference with the other, in the sense in which a new bridge or a ferry interferes with a prior one established at the same point.

The influence of the rail road on the complainants profits from their bridge, is more analogous to that which has been effected

in respect of many branches of business, by the astonishing improvements of the last thirty years. The Erie canal broke up and destroyed the long lines of heavy teams which formerly monopolized the transportation west of Albany ; and diminished more than one-half, the profits of the turnpike companies between Albany and Canandaigua. The line of rail roads which succeeded, drove from the road the throng of stage coaches, which were profitably employed in the conveyance of passengers to and from the great west. Yet neither the army of teamsters thrown out of business, nor the turnpike corporations, ever claimed compensation from the state in respect of the Erie canal; nor did the stage owners claim redress against the rail road companies, which destroyed their business, and diminished one-half, the value of their capital. If it be answered, that most of these were mere individuals, or the enterprises of men associated together, and not basking in the sunshine of legislative privilege ; I reply, that the turnpike companies were corporations, and that the others invested capital in a business, *quasi* public, and acquired a valuable good will in their pursuits, with as much claim on the favor and protection of the state, as the builders of the Harlem bridge ; with this difference only, that the latter had no right to set up their bridge without the permission of the state, wh le the pursuits of the former were open to all.

If then the progressive spirit of the age, have developed and matured a mode of conveying passengers and freights, from place to place, across rivers and over morasses, which was unknown in 1790; can there be any doubt that the legislature, in the exercise of its sovereign duty to provide ways for the use of the people, may authorize the construction and use of such new invention, although the necessary consequence may be, that the prior modes of conveyance will be superseded, and those who were profitably engaged in their pursuit, will be subjected to the loss of their business and capital ? I think the right and the duty of the legislature in such a case, is too clear to be questioned ; and that those who were enjoying franchises previously conferred, which are thereby rendered worthless, stand in no worse position and are no more entitled to sympathy or compensation, than the numerous classes of mechanics and other individuals,

who are daily subjected to great losses and sacrifices, by new inventions and improvements, superseding and destroying those in profitable use.

An analogous case in our own courts is that of *Lansing* v. *Smith and others*, (8 Cowen, 146, affirmed in 4 Wend. 9,) where the wharves of the owners of lots in the city of Albany, were rendered almost valueless, by the erection of the Albany pier, under an act of the legislature.

Previous to the decision of the Charles River Bridge case, the supreme court of New Hampshire held that the grant of a ferry, did not prevent the legislature from granting to another person, the exclusive right of erecting a toll bridge within certain limits, which included the place where the ferry was situated. And the court expressed their opinion, that were there no terms of exclusion in the grant of the bridge, another bridge might be authorized within the same limits. There being an exclusive grant of the bridge in that case, the court decided that the legislature could not authorize the erection of another bridge, without provision for the compensation of the first grantee. (*Piscataqua Bridge* v. *New Hampshire Bridge*, 7 N. H. Rep. 35, 59.)

And the supreme court of Alabama had held in 1835, that the grant of a ferry, where it was not exclusive, did not prevent the legislature from chartering a toll bridge near the ferry, without making any provision for compensation to the owner of the ferry. (*Dyer* v. *Tuscaloosa Bridge Company*, 2 Porter's R. 296.)

Subsequent to the case of Charles River Bridge, the court of appeals in Virginia, unanimously held that a monopoly cannot be implied, from the grant to construct a work of public improvement and to take the profits; to give such monopoly, there must be an express provision in the act or charter, whereby the legislature restrains itself from granting charters for rival and competing works. And the court applied the doctrine in a suit by a canal company, against a company subsequently chartered to construct a rail road along the same valley. (*Tuckahoe Canal Company* v. *Tuckahoe Rail Road Company*, 11 Leigh's R. 42, 69, 73.)

Such being the established law on the subject, I must, on both grounds, decide against granting to the complainants any relief founded upon the assumption that the Harlem Rail Road Company have no right to maintain the bridge in question across the Harlem River, for the use of their rail road.

There remains another, though very inferior ground of relief set up in the bill, which is reposed on the alleged misuser of the bridge by the defendants, by permitting, or by their negligence suffering, persons who had no right, to pass over the bridge, and thereby evade the payment of the tolls to which the complainants were entitled.

I do not think that there can be any account, in connection with this injury alone. There is no pretence that the defendants have received any money from persons who have evaded the toll bridge. They have no right to receive compensation for crossing the rail road bridge, and they have not claimed any such right.

The injury to the complainants, is one in the nature of damages. The remedy provided by the second section of the act of 1790, gives a penalty which a court of equity will not enforce; and they can have no redress here, except as incidental to some other relief which this court has jurisdiction to grant. Still if it shall appear that they are entitled to an injunction on this branch of their case, it will then be proper to direct an account of what they might have received in tolls, but for the acts or omissions of the defendants.

As to the remedy by injunction, I am satisfied that the unauthorized use of the rail road bridge alleged in the bill, constitutes such a nuisance to the complainants in the enjoyment of their franchise, that they are entitled to an injunction to restrain it in future.

The rightful use of the bridge, is restricted by law to the purposes of the rail road, and the private use of the inhabitants of Morrisania. The act of 1837 permitting its erection, provided that it should be used in conformity with the right reserved to those inhabitants in the act of 1790, granting the complainants bridge, *and not otherwise.* Thus there was attached to the private bridge, the reasonable condition, that those erecting and

maintaining it should so keep and, use it, that it should not interfere with the rights and privileges vested in the owners of the toll bridge.

If it be made to appear that the owners of the Morrisania bridge, have failed so to keep and preserve the same from being used by persons not authorized to use it; the difficulties in the way of ascertaining and proving every case, or even a considerable portion of the instances, of such improper use of the bridge and the great facility for evading the complainants bridge, and the excessive injury to their franchise which such carelessness of the owners of the other bridge may occasion; furnish abundant grounds for this court to restrain the owners by injunction. The complainants right being undisputed, the case falls within the ordinary jurisdiction of the court against nuisances.

I have looked into the testimony relating to the use of the rail road bridge by persons not authorized, and am satisfied that the rail road company have not exercised that diligence to prevent such persons crossing their bridge, which they were bound to do in reference to the complainants franchise. By their purchase of a bridge already built, adapted to the ordinary travel of the country, they became liable to this duty, which before was incumbent on those who erected it. If they had built a bridge for the use of their rail road only, it would have had no floor or proper conveniences for ordinary travel, and they would not have been subjected to this burthen.

There is nothing in the case however, to implicate the Morris's in this disregard of the complainants rights. Their erection of the bridge, and their sale of it was lawful; and in the conveyance to the rail road company, they stipulated for no other or further use of the bridge for ordinary travel, than they were entitled to while they owned it.

And the testimony does not prove that during the time they owned and controlled the bridge, there was any use made of it to the complainants detriment, or that they were negligent in preventing unauthorized persons from travelling over it.

The complainants having failed to establish any ground of relief against the Messrs. Morris's, the bill as to them must be dismissed with costs.

As to the Harlem Rail Road Company, the complainants appear to be entitled to an injunction, restraining the company during the residue of the term of the complainants franchise, from permitting or suffering the bridge in question to be used for the passage of any vehicles, foot passengers or animals, for the passage of which over their bridge the complainants are authorized to demand toll; or for any purpose, save the use of the company's rail road, and the private use of the inhabitants of Morrisania.

The details of the injunction will be adjusted on settling the decree; and the complainants may have liberty to apply on the foot of the decree, for future relief in case the injunction be violated.

I will also dispose of the question of costs between these parties, to this time, by directing that neither party shall recover costs against the other. The complainants have shown a case for relief, though they have failed in the principal object of their suit.

They are entitled also to a reference, to ascertain what tolls they have lost since the rail road bridge was conveyed to the company, in consequence of the neglect or omission of the company to prevent its use by persons who were not authorized to make use of it without paying toll to the complainants. But I doubt whether this right to a reference, will pay the expense of its prosecution; and I will direct that if the complainants take a reference and fail to make out a demand exceeding $100, they shall pay the rail road company's costs of the reference and proceedings thereon. If they make out more than $100, the company will be decreed to pay the amount to them, with the costs, subsequent to the entry of the decree.