NEW YORK, The (MERCHANTS TRANSP. CO. OF NORWICH v.). See Case No. 9,-454.

NEW YORK (MILLER v.). See Case No. 9,-585.

NEW YORK (MILNE v.). See Case No. 9,-618.

## Case No. 10,197.
### NEW YORK v. NEW ENGLAND TRANSFER CO.
[14 Blatchf. 159; 15 Alb. Law J. 199.] [1]
Circuit Court, S. D. New York. March 10, 1877.

FERRY — EXCLUSIVE RIGHT TO ESTABLISH — WHAT IS INVASION OF SUCH RIGHT—LEGISLATIVE INTERFERENCE.

1. By the 15th section of the Montgomerie charter, granted to the city of New York in 1730, there was granted to the corporation of that city the sole power of establishing such ferries "around Manhattan's Island," "for the carrying and transporting people, horses, cattle, goods and chattels from the said Island of Manhattan to Nassau Island, and from thence back to Manhattan's, and also from the said island, Manhattan's, to any of the opposite shores all around the same island," in such and so many places as the common council should think fit, and the ferriages from such ferries were also granted to the corporation. The boundaries of the city were made co-extensive with Manhattan Island. In 1874, part of another county was annexed by the legislature of New York to the city of New York, and declared to be a part of the city as if it had always been so, and the like powers were given to the corporation, over the annexed territory, as if it had always been a part of the city. Afterwards, a ferryboat, fitted up to transport railroad cars only, was run to and fro between a place in such annexed territory and a place in New Jersey opposite the city of New York, connecting with railroads running from the termini of the ferry. The boat was provided with two railroad tracks, which prevented the entrance of ordinary vehi-

1 [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission. 15 Alb. Law J. 199, contains only a partial report.]

cles and of foot passengers, except as transported in the cars: *Held*, that such ferry was not such a ferry as the charter contemplated, and did not invade the exclusive franchise of the corporation.

2. Whether the legislature can interfere with the ferry franchise granted by said charter, quere.

3. Whether the franchise so granted is limited to establishing ferries from the original territory of the city, quere.

In equity.

George Ticknor Curtis, for plaintiffs.

Simeon E. Baldwin and George H. Forster, for defendants.

SHIPMAN, District Judge. This is a bill in equity, which is brought by the corporation of the city of New York, to restrain the defendants from operating a ferry, without the license of the plaintiffs, from Mott Haven, on the north shore of the Harlem river, within the 23d ward of the city of New York, to Jersey City. The following agreed statement of facts specifies the character and uses of the boat which is employed by the defendants, the route over which the boat passes, and the object for which the said boat and route are used: "The defendants are a corporation, organized under the laws of the state of Connecticut. A certified copy of their charter may be read in evidence. They hold a contract with the United States for the carriage of certain mails. They are owners of a side-wheel steamboat, called the Maryland, of about 1,093 tons burthen, enrolled and licensed for the coasting trade, under the laws of the United States. The said steamboat is constructed as what is popularly called a 'double ender,' i. e., with open ends for entrance upon and egress from the main deck fore and aft, and capable of being run either end foremost, having at each end a rudder controlled from the rudder wheel in the pilot house on the upper deck, but she is not adapted to or capable of the transportation of ordinary vehicles or traffic, and her sole purpose and adaptation is to the transfer of railroad cars. On the main deck two railroad tracks are laid down, occupying the entire space on the main deck to the bulkheads on the sides of the vessel, extending from end to end of the boat, and preventing the entrance or egress of vehicles, and also of passengers, baggage or freight, except as the same may be transported in railroad cars run over the said railroad tracks, which are so adjusted as to connect with corresponding tracks on the platform or bridge at the railroad dock, or of the railroad landing place to which the boat runs. Cars containing passengers and their baggage, other freight and mails, are run upon the boat at the place of embarkation, on the arrival of trains at the terminus of the railroad at such place of embarkation, and are run off from the boat at the place of disembarkation, for further transportation by land; but no passengers, baggage, freight, goods or merchandise are taken or transported on said steamboat, except as the same may be contained in railroad cars run on and off said tracks as aforesaid. Used in this manner, the Maryland has been employed by the defendants since the 10th day of May, 1876, for the transfer of drawing room, sleeping and ordinary passenger cars containing passengers and baggage, freight, express and mail cars containing baggage, freight, express matter and mails, from a point at a place called 'Mott Haven,' on the north shore of the Harlem river, now within the Twenty-Third ward of the city of New York, but formerly the town of Morrisania, in the county of Westchester and state of New York, to a point in Jersey City in the state of New Jersey, at the dock of the Pennsylvania Railroad Company, and vice versa. The trips of the Maryland are dependent upon the arrival of trains connecting by railroad from places north and east of the city of New York, and arriving at Mott Haven, bound south and southwest, and upon the arrival of connecting trains by railroad from places south and southwest of Jersey City, arriving at that city and bound north and northeast, with no other delay of the journey than such as is necessary to run the cars on and off the boat. The drop platform or bridge at Mott Haven, by means of which the cars of the defendants are run upon and off from the deck of the Maryland, is so constructed and operated as to rise and fall with the tide in the Harlem river; but it does not project into the river beyond the natural line of low-water mark, sufficient artificial excavation having been made to give ample depth of water to float at any tide. The course of the Maryland on leaving the dock at Mott Haven is down the Harlem river to its junction with the East river, down the East river southward to the bay of New York, through the said bay around the Battery to the Hudson or North river, and up the Hudson river to the dock at Jersey City in the state of New Jersey, on the west shore of the Hudson river, and crossing the dividing line between the states of New York and New Jersey in the course of the trip. On the trip of the boat from Jersey City to the place of landing at Mott Haven, the course (being reversed) is over the same water. No fixed or separate toll is charged or taken by the defendants in respect to the carriage of passengers' baggage or freight upon the said steamboat, but the defendants operate their said route as a part of a continuous line for the transportation to the place of destination, of passengers, baggage, freight, mails, and other property, on their way from places north and east of the city of New York, in the states of Massachusetts, Connecticut and New York, to places respectively south and southwest of the said city of New York, in the states of New Jersey and Pennsylvania, respectively, and vice versa, under arrangements made by the defendants.

with the New York & New England Railroad Company, the Hartford, Providence & Fishkill Railroad Company, the New York, New Haven & Hartford Railroad Company, the Pennsylvania Railroad Company, and the other railroad companies whose roads form a part of said continuous lines, and which are incorporated and exist under the laws of the states of Massachusetts, Rhode Island, Connecticut, New York, New Jersey and Pennsylvania, and, as part of such continuous line between Mott Haven and Jersey City, the defendants transport such passengers, baggage and freight by water, in the manner above mentioned. Neither of the railroad companies above mentioned had separately or jointly, prior to the 10th day of May, 1876, established or effected a transportation of passengers, baggage, freight or mails, or by means of what is herein described as the continuous route between Mott Haven and Jersey City. Through coupon tickets, in the usual form, are sold to the passengers. The compensation of the defendants for the carriage by water between Mott Haven and Jersey City, is included in a through rate, and collected by the railroad companies selling a through ticket to a passenger or delivering freight to a consignee, and is paid over to the defendants. The compensation of the defendants in respect to the carriage of United States mails upon the said continuous line and route, by their said steamboat, is paid to said defendants by the postmaster-general, in the manner established by law, and is fixed by and included in a contract made between the defendants and the post office department of the United States, for the transportation of such mails over their portion of said continuous line, from places north and east of the city of New York to places south and southwest of the said city of New York, and vice versa. The Pennsylvania Railroad Company own and control the dock and slip at Jersey City, and the New York, New Haven & Hartford Railroad Company own and control the dock and slip at Mott Haven, and purchased the same prior to the passage of chapter 613 of the Laws of New York, 1873, up to which time the place called Mott Haven was, as it had ever prior thereto been, a part of Westchester county. Neither the mayor, aldermen and commonalty of the city of New York, nor the common council of said city, have ever taken any action to establish any ferry between the termini of the route navigated by the said steamer Maryland, nor over any other route or line with which said Maryland competes or interferes. The maps identified by the signatures of the counsel for the respective parties, and made under the direction of Mr. G. W. Greene, Jr., engineer-in-chief of the department of docks, are admitted to be correct, and may be referred to at the hearing by either party. All charters, grants and legislative acts of the state of New York, of the United States, or of any state of the United States, material to this cause, may be referred to, on the hearing thereof, by either party."

The Montgomerie charter, granted in 1730 (4 Geo. 11.), "is the chapter upon the foundation of which the city of New York is at present governed." Kent's Charters, note 19, p. 212. It recited and ratified the Dongan charter, which was the first English charter granted to the city of New York, in 1686, and the Cornbury charter, granted in the 7th of Queen Anne, and conferred new and additional powers upon the corporation. By the 15th section of the Montgomerie charter, the crown of England granted and confirmed to the mayor, aldermen and commonality of the city of New York, and their successors, forever, "the sole, full and whole power and authority of settling, appointing, establishing, ordering and directing * * * such and so many ferries around Manhattan's Island, alias New York Island, for the carrying and transporting people, horses, cattle, goods and chattels from the said Island of Manhattan to Nassau Island, and from thence back to Manhattan's, and also from the said Island Manhattan's to any of the opposite shores all around the same island, in such and so many places as the said common council" shall think fit. The rents, issues, profits, ferriages, fees and other advantages arising from such ferries were also granted to the said corporation. By the 37th section, there was also a grant of the existing ferries, "and all other ferries now and hereafter to be erected and established all round the island of Manhattan's." The boundaries of the city were made co-extensive with Manhattan Island.

By an act of the legislature of the state of New York, passed May 6, 1874 (Laws 1874, c. 329), the towns of Morrisania, West Farms and King's Bridge, all of Westchester county, were annexed to the city of New York, and were constituted the 23d and 24th wards of that city. The first section of this act declared that this territory was thereafter to be a part of the city, and to be entitled to the immunities, privileges and franchises of the city, in every respect, and to the same extent, as if the annexed territory had always been included within the city. The eleventh section provided that the mayor and common council of the city of New York should thereafter exercise over the annexed territory the same powers, in like manner and to the same extent, as if said territory had always been a part of the city of New York, except as limited or excepted by the act itself.

Upon the foregoing facts, three questions of law arise: 1st. Did the city of New York obtain, by the Montgomerie charter, exclusive power to establish all the ferries from the original limits of the city to any of the opposite shores? 2d. Was this exclusive franchise extended to and impressed upon the annexed territory, so that a ferry could not be established from a point within the 23d ward, without the license of the common council, or is the franchise limited to

the establishment of ferries from Manhattan Island? 3d. Is the user, by the defendants, of the Maryland upon its route, a ferry, within the true meaning of the Montgomerie charter?

1. The grant was of an exclusive right in the corporation to establish future ferries from any part of the original territory of the city, to any of the opposite shores, and to receive, for the exclusive benefit of the corporation, the ferriages arising therefrom, or the emoluments arising from any ferry licenses which the common council might give. Whether the legislature of New York can or cannot interfere with this exclusive grant, and divest the city of the rights which it acquired by such charter, is a question which has not yet arisen. The grant seems to have been one of property as well as of public or political power; and, whenever the question shall arise in regard to the control of the state, acting by its legislature, over the grant, the remarks of Chancellor Kent, in his notes to the charters of New York (note 30 p. 235), in opposition to the theory that the grant is within the reach of gratuitous legislative resumption, will undoubtedly receive the consideration which has always been given to the opinions of that eminent judge. Benson v. New York, 10 Barb. 223; Darlington v. New York, 31 N. Y. 164, 203; People v. Mayor, etc., 32 Barb. 102; Mayor, etc., v. New York & Staten Island Ferry Co., 40 N. Y. Super. Ct. 232.

2. The second question is, whether the exclusive franchise is or is not limited to the establishment of ferries from Manhattan Island, the original territory of the city. The grant, which has been heretofore substantially recited, was a grant of an exclusive right to establish ferries around Manhattan Island, from said island to any of the opposite shores. On the one hand, it is urged, that municipal jurisdiction extended throughout the whole island, and that, whenever, in either of the three charters, Manhattan Island was referred to, it was referred to for the purpose of designating the territory made subject to the corporate franchises and powers of the city, and was referred to as the territorial limit to which the ferry franchises could then extend, because the island and city territory were then identical, and that the meaning of the charter is, that, wherever the jurisdiction of the corporation extended, namely, throughout the island, that territory was affected with a corporate and exclusive right in the corporation to establish all needful ferries, and that the powers which the mayor and common council rightfully exercised over the old territory, were by the act of annexation, to be exercised over the new teritory, to the same extent as if such teritory had always been a part of the city, and that thus the ferry franchises were extended to and impressed upon such new territory. On the other hand, it may be urged, that the charter was of

a municipal corporation, which was established upon an island; that the prosperity, and the very existence of the city depended upon its abundant, permanent and regular means of intercourse with the main land; that there was a necessity that the city should be furnished with the exclusive power to authorize the permanent establishment of regular and frequent means of communication with the opposite shores and with Long Island; that, therefore, the power was given to the corporation to connect the island by ferries with other places, as a power indispensable to the welfare of the city; that this power, being in terms for the establishment of ferries around the island, was not, by the act of annexation, extended to a power to establish ferries from the newly acquired territory beyond the island, but the construction of the grant should be governed and controlled by the circumstances which existed when the charter was given, and which made such a grant necessary; and that, therefore, the city of New York, as enlarged by the annexation, possesses only the same franchise which it previously had —that of establishing ferries from the island, and not necessarily from the territory of the city, and that this construction limits the grant to the natural meaning of the words employed. The view which I take of the third question, renders it unnecessary to express an opinion upon this point.

3. Is the liberty or privilege, which the defendants now use, of running the steamer Maryland, in the manner and for the uses described in the statement of facts, a ferry, within the meaning of the grant in the Montgomerie charter? In Bridge Proprietors v. Hoboken Co., 1 Wall. [68 U. S.] 116, the supreme court held, that a railroad bridge, which was an extension of the iron rails which composed the material part of a railroad over the Hackensack river, together with such substructure as is necessary to keep the rails in place and enable them to support the cars, was not a bridge, within the meaning of an act of the legislature of New Jersey, passed in 1790, by which that state empowered certain commissioners to contract for the building of a bridge over the Hackensack, and provided that it should not be lawful for any person to erect any other bridge across the said river for ninety-nine years. The decision was upon the ground that a railroad bridge, on which there was "no planked bottom, no roadway or path, nothing on which man or beast or vehicle could pass, save as it is carried over in the cars," was not a bridge, within the minds of the framers of the act of 1790, or within the true intent and meaning of the exclusive grant contained in that act. To the same effect are Mohawk Bridge Co. v. Utica & S. R. Co., 6 Paige, 554; McRee v. Wilmington & R. R. Co., 2 Jones (N. C.) 186; Thompson v. New York & H. R. Co., 3 Sand. Ch. 625. The decision in Enfield Toll Bridge Co. v.

Hartford & N. H. R. Co., 17 Conn. 40, where the contrary doctrine was ably maintained, is not in accordance with the prevailing opinion which is now entertained by the courts of this country.

The reasoning which denies that a railroad bridge is an interference with an exclusive right theretofore granted to build an ordinary bridge, applies with almost equal force to the question, whither a ferry franchise is interfered with by a ferry which is designed for the transportation of railroad cars only. The boat of the defendants is provided with two railroad tracks, which prevent the entrance or egress of ordinary vehicles, and also of foot passengers, except as they are transported in cars which run upon the railroad tracks. The boat is exclusively used for the transportation of railroad cars, in connection only with the arrival of trains. It is impossible to transport ordinary vehicles upon the boat, it is impracticable to transport foot passengers, except as they are conveyed to the boat in cars. The whole arrangement of boat and docks is for the ingress and egress of railroad cars, and not for the accommodation of anything else. The ferry is a part of a continuous through railroad line from places north and east of the city of New York, to places south and southwest of that city, and the trips of the boat are dependent upon the arrival of through railroad trains.

Such a ferry is unlike an ordinary ferry for the transportation across a river of persons, animals and freight, at intervals more or less regular, for fare or toll. The ordinary ferry is a substitute for the ordinary bridge, and is a means of transportation of all persons and ordinary vehicles, and is for the accommodation of the public generally, and should, therefore, be accessible to the public. The railroad ferry is a substitute for a railroad bridge, and is a part of a railroad route for the transportation of the cars which are used upon a railroad track, and the burden which they bear, and is not for the accommodation of any persons except those who happen to be, for the time being, railroad passengers. A railroad ferry is a means of connecting railroad tracks, or two railroads, as a railroad bridge is the continuation of railroad tracks across a stream of water. It differs widely, except in name, from a general or unlimited ferry (Fitch v. New Haven, N. L. & S. R. Co., 30 Conn. 38), and is not within the spirit of the grant which was made to the city of New York in the year 1730; and the adoption of the word ferry, "to express the modern invention, does not bring it within the terms of the" charter, "if it is not within the intent of it." (Bridge Proprietors v. Hoboken Co., 1 Wall. [68 U. S.] 116).

But, it is urged, that, in Aikin v. Western R. Corp., 20 N. Y. 370, a ferry which was used by a railroad for the transportation of its passengers and freight, has been held to interfere with a ferry franchise theretofore granted. The ferry which the Western Railroad Company used at Albany was not the ferry which is described in the agreed statement of facts, and which is now known as a railroad ferry, and designed for the transportation of cars, although it was used by a railroad corporation, but was an ordinary steamboat and transported other persons, teams and carriages than such as were borne upon the railroad. It was justly held, that the maintaining by a railroad company of a ferry, upon which it regularly and constantly transported gratuitously persons not passengers nor in its service, was an invasion of the right of a proprietor of a ferry franchise. The decision in this case does not conflict with the doctrine which is recognized in Fitch v. New Haven, N. L. & S. R. Co., 30 Conn. 38.

It results, that the establishment of the railroad ferry of the defendants is not an invasion of the exclusive franchise of the plaintiffs, assuming that their franchise was extended to the territory which was annexed in 1874.

Let there be a decree dismissing the bill.

---

NEW YORK. (NEW YORK & N. H. R. CO. v.). See Case No. 10,199.

NEW YORK (RANSOM v.). See Case No. 11,-573.

NEW YORK. The (SCHURTZ v.). See Case No. 12,492.

NEW YORK. The (WALDORF v.). See Case No. 17,057.

NEW YORK (YOUNGS v.). See Case No. 18,-185.

NEW YORK & B. BRASS CO. (WATERBURY BRASS CO. v.). See Cases Nos. 17,-255 and 17,256.

NEW YORK & L. B. R. C. (PENNSYLVANIA R. CO. v.). See Case No. 10,953.