NEW YORK CENTRAL AND HUDSON RIVER RAILROAD COMPANY, PROSECUTORS AND DEFENDANTS IN ERROR, v. THE BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF HUDSON, DEFENDANTS AND PLAINTIFFS IN ERROR.

Submitted July 12, 1908—Decided June 14, 1909.

1. The act of 1799 (*Gen. Stat., p.* 1469), empowered the board of chosen freeholders to fix the rates to be taken at the several ferries within their several counties. The board of chosen freeholders of Hudson county in 1905, by resolution, fixed the rates to be charged at certain ferries in Hudson county for the transportation of foot passengers from Hudson county to New York. These ferries were distinct corporations, but were leased to and operated by a railroad company. *Held,* that the validity of the resolution fixing rates of ferriage is settled in this court by its decision in *Chosen Freeholders of Hudson County* v. *State,* 4 *Zab.* 718.

2. The line of later cases decided by the federal Supreme Court ending with the case of *St. Clair County* v. *Interstate Sand and Car Transfer Co.,* 192 *U. S.* 454, has not definitely decided that a state cannot fix rates for ferriage from itself to another state; and, therefore, it cannot be regarded as finally decided in the federal court that the decision in 4 *Zab.* 718 is in conflict with, and is therefore superseded by, the federal decisions.

3. The rates fixed by the resolution under review apply only to the passage of foot passengers from Hudson county over technical ferries; and the resolution does not include a fixing of rates chargeable by a railroad company for a passage by a railroad passenger over its road and over ferries, which, under the act of 1903 (*Pamph. L., p.* 656), is operating a ferry as an appendage or extension of its road.

4. The Interstate Commerce act of 1887 does not strip a state of any power to fix rates of ferriage which it theretofore possessed.

5. The treaty between New York and New Jersey, by which New York has exclusive jurisdiction over the waters of the Hudson river, does not affect the question of power involved in this case.

On *certiorari.*

For the plaintiff in error, *John Griffin.*

For the defendant in error, *Vredenburgh, Wall & Carey* and *Thomas Emory* (of the New York bar).

The opinion of the court was delivered by

REED, J. This writ brings up a judgment of the Supreme Court setting aside certain resolutions of the board of chosen freeholders of Hudson county, which resolutions were brought into the Supreme Court by *certiorari.*

The resolutions were adopted under the authority of the act passed in 1799 (*Gen. Stat., p.* 1469), entitled "An act concerning ferries." This statute enacts that the board of chosen freeholders shall be and they hereby are empowered and directed to fix the rates to be taken at the several ferries within their respective counties, and the same from time to time to revise, alter, amend or make anew at their discretion.

The board of chosen freeholders of Hudson county on May 4th, 1905, passed a resolution to inquire into the rates of ferries charged at the several ferries within the county of Hudson outside of the cities of Jersey City and Hoboken. After notice given to the different ferry companies, including the defendant in error, and after interrogatories were served upon and answered by the defendant in error, and after an investigation of the matter of the rates of ferriage, the board of chosen freeholders, on July 6th, 1905, resolved

that the board fix the rates of ferriage to be charged by the companies carrying passengers between Hudson county and the city of New York to the terminal of the said ferries in the city of New York, and from said terminal returning to the county of Hudson, at the rate of six cents for each adult person for the round trip, and four cents for each person under ten years of age. On the same date the board resolved that it fix the rate of ferriage to be charged by the said ferry companies for transportation of foot passengers from the county of Hudson by said ferries to the terminal of said ferries in the State of New York at the rate of three cents for each adult person, and two cents for each person under ten years of age.

The prosecutors and defendants in error—the New York Central and Hudson River Railroad Company—are the lessees and operators of the ferries between Weehawken in Hudson county, New Jersey, and Franklin street, New York City; between Weehawken and Forty-second street, New York City, and between West New York, New Jersey, and Forty-second street, New York City.

The Supreme Court held that the above resolutions were invalid upon the ground that the regulation of the rates of ferriage for foot passengers across the Hudson river from New Jersey to New York is a regulation of interstate commerce, over which the power of congress is paramount.

The question whether under the federal constitution the State of New Jersey was excluded from the regulation of tolls to be charged by the ferry companies having one of their *termini* in the State of New Jersey is thus presented upon this writ of error to this court.

The argument divides itself broadly into two questions—whether the legality of the resolutions, so far as respects the judgment of the courts of this state, has been definitely settled, and second, whether if the question is *stare decisis* in this court, a different doctrine has been pronounced and settled by the Supreme Court of the United States.

The counsel for the plaintiff in error insists that the right to pass the resolution now questioned was settled by this

court in the case of *Chosen Freeholders of Hudson County* v. *State,* reported in 4 *Zab.* 718. In that case, the New Jersey Railroad and Transportation Company, "which company," in the language of Judge Elmer, "carried on the Jersey City ferry," prosecuted a writ of *certiorari* to bring up a resolution of the board of chosen freeholders in Hudson county, fixing the rates of ferriage to be taken at the Jersey City terminus. In the Supreme Court (3 *Zab.* 206), as well as in this court, in that case, the power of the state to enact the statute of 1799, and the validity of the resolution passed in conformity with the provisions of that act, were upheld.

The defendants in error insist that the facts in the former case are distinguishable from the facts in the present case in two particulars, either of which deprives the former decision of a controlling force in settling the present question.

It is first insisted that in the former case, the resolution purported only to fix ferriage fees for the carrying of passengers to the state line, while the present resolution fixes carrying fees for passage across the Hudson river to the New York side, and for a return trip.

It is quite clear, however, that the decision in the former case did not go upon the ground that the rates to be charged by the resolution then in question were confined to the carriage of passengers to the middle of the Hudson river, or to the boundary line between New Jersey and New York.

The depositions taken in that case showed that there was a ferry having one terminus at Jersey City in this state, and the other terminus in New York. The resolution in that case fixed the rate of ferriage to be taken at Jersey City. *State* v. *Freeholders of Hudson,* 3 *Zab.* 206, in the Supreme Court.

In the statement of facts prefixed to the opinion in 4 *Zab.* 718, in this court, it appears that the resolution of the board of chosen freeholders fixed the rate of ferriage over the ferry from Jersey City to New York.

Justice Elmer, writing the opinion for this court, said: "I am satisfied that the New Jersey statute applies to all ferries having one terminus in this state; consequently the

board of chosen freeholders have power to fix the rates for those between this state and the city of New York." And later, in his opinion, when the learned judge came to the discussion of the point that the regulation of the rates of fare for carrying passengers was a regulation of interstate commerce which belonged to congress, he, in holding that it was not such a regulation, did not intimate that the resolution was justified because the rates fixed were for a passage to the boundary line of the state. Justice Elmer said this: "That the state may regulate the tolls and fare for turnpikes, railroads and ferries wholly within its jurisdiction, counsel have not gone so far as to deny. But such regulation will, in many cases, affect the commerce among the several states, as much as the regulation of tolls at a ferry directly between two states. A large part of the commerce between Philadelphia and New York passes by means of the roads and canals through New Jersey, which latter state has always regulated the tolls without question. If the states separately or jointly cannot regulate a ferry between two of them, neither can they authorize the building of a bridge, or prescribe the tolls for passing it. These and like powers have been exercised by most of the states of the union without doubt or hesitation, from the adoption of the constitution to the present day, and are, in my opinion, in nowise repugnant to the provisions of that instrument."

So there seems to be no diversity of facts in the two cases in respect to the particulars mentioned.

It is again said that the two cases are distinguishable in this, that in the former case, the ferry, although operated by the New Jersey Railroad and Transportation Company, was distinct from the railroad company; while in the present case the ferry is not distinct from the New York Central and Hudson River Railroad Company, but is, in fact, a continuation of that railroad.

It is not perceptible, however, wherein the distinction lies. It is true that the number of railroad passengers now crossing ferries is larger than the number of railroad passengers that crossed the ferries in 1851; but so far as appears

both ferry companies existed as distinct entities, with the liability of common carriers, and each ferry company was kept by a railroad company, and operated for the use of all passengers, whether railroad passengers or not.

It is again insisted that the case of State *v.* Freeholders of Hudson County, as a decision, is discredited by a later decision of this court, namely, *Erie Railroad Co.* v. *State,* 2 *Vroom* 531. That case involved the power of the legislature to impose a direct tax upon goods while in transit through this state, from one to another foreign state. The Supreme Court had held that the power existed, and in the opinion of Justice Haines of that court, State *v.* Freeholders of Hudson was cited *arguendo* in support of the position that the regulation of fares and tolls upon turnpikes, railroads and ferries, even directly between the states, was wholly within the jurisdiction of the states, and was in nowise repugnant to the provisions of the federal constitution.

In the opinion of Chief Justice Beasley, delivered in this court, reversing the Supreme Court, the case of *Chosen Freeholders of Hudson County* v. *State, supra,* was not mentioned. The Chief Justice, however, was dealing with the question of taxation upon goods in transit. He was not dealing with the exercise of the police power in regulating exactings by a common carrier.

The question in hand was not whether a state could levy a tax upon interstate commerce, but whether the imposition then under consideration was a tax upon interstate commerce. The tax was in the shape of a transit duty of three cents on every passenger, and two cents upon every ton of merchandise, excepting passengers and freight transported exclusively within the state. The passengers and merchandise upon which the duty was laid were transported from and to other states across New Jersey.

It was held that the duty was a direct tax upon commerce.

Having reached this result, the conclusion was obvious, for following his line of reasoning in *McCulloch* v. *Maryland,* 4 *Wheat.* 316, Chief Justice Marshall had, as early as 1827, in

his opinion in *Brown* v. *Maryland,* 12 *Id.* 419, declared that the taxing power of the state must have some limits; that if the states may tax all persons and properties found in their territory, what shall restrain them from taxing goods in their transit through the state, from one port to another, for the purpose of re-exportation? Or what should restrain a state from taxing any article passing through it from one state to another for the purpose of traffic? Or from taxing the transportation of articles passing from the state itself to another state for commercial purposes? These cases are all within the sovereign power of taxation, but would obviously derange the measures of congress to regulate commerce, and affect materially the purpose for which the power was given.

From the date of the last decision it was never questioned that a state possesses no power to levy a tax upon the business of interstate commerce.

But the imposition of a tax upon business or capital is not an exercise of the police power; and it was the exercise of the police power with which Judge Elmer was dealing in his opinion in the case of State *v.* Freeholders of Hudson, under which power, in the language of Judge Cooley, "numerous illustrations might be given of the power of the states to make regulations affecting commerce which are sustainable as regulations of police." *Cooley Const. Lim.* 584.

In discussing the question involved in the Erie Railroad case there was no reason for either approving or disregarding the decision in the Freeholders of Hudson case. Besides, in view of the cases in the federal Supreme Court previous to 1864, the date when the opinion in the case of *Erie Railroad Co.* v. *State, supra,* was prepared, it is not conceivable that the Chief Justice for a moment thought of impugning the doctrine laid down in the case of State *v.* Freeholders of Hudson County, either by his silence, or otherwise. The cases alluded to were Fanning *v.* Gregoire and Conway *v.* Taylor.

In the case of *Fanning* v. *Gregoire,* 16 *How.* 524 (decided in 1853), a question arose respecting the power of the State of Iowa to empower and authorize the city of Dubuque to license certain persons to establish a ferry across the Missis-

sippi river, and fix the rates of ferriage. It was held that a previous grant of the legislature of the Territory of Iowa was not exclusive, and that the later grant was valid.

In the opinion of Mr. Justice McLean he said: "The argument that the free navigation of the Mississippi river, granted by the ordinance of 1787, or any right which may be supposed to arise from the exercise of the commercial power of congress, does not apply to this case. Neither of these interfere with the police power of the state in granting ferry licenses. When navigable rivers within the commercial power of the union may be obstructed, one or both of these powers may be invoked."

In 1861 the case of *Conway et al.* v. *Taylor, Executor,* 1 *Black* 603, was decided by the federal Supreme Court. In that case the legislature of Kentucky had granted ferry rights to one James Taylor from his landing in front of the town of Newport, across the Ohio river, with authority to receive the same fares which were allowed for transportation from the opposite shore. It was held that this grant was valid; that it could not be infringed by another person setting up another ferry. In vindication of the Kentucky legislation Mr. Justice Swayne said: "Undoubtedly the states, in conferring ferry rights, may pass laws so infringing the commercial power of the nation, that it would be the duty of this court to annul them. The contention is one of extreme delicacy, and only to be performed where the infraction is clear. The ferry laws in this case are not of that character. We find nothing in them transcending the legitimate exercise of the power of the state."

And again the learned judge observed: "There has been now for three-quarters of a century a practical construction of the constitution. During all that time, as before the constitution and its birth, the states have exercised the power to establish and regulate ferries—congress, never. We have sought in vain for any act of congress which involves the exercise of this power. That the authority lies within the scope of the immense mass of undelegated powers which are

reserved to the states respectively, we think too clear to admit of doubt."

In *Conway* v. *Taylor, supra*, Mr. Justice Swayne cited the case of *State* v. *Freeholders of Hudson County, supra*, in support of his conclusions.

So that at the time when the case of *Erie Railroad Co.* v. *State, supra*, was decided, there was nothing in the federal decisions to suggest that the doctrine announced in *State* v. *Freeholders of Hudson, supra*, was in the least doubtful; but on the contrary the highest federal tribunal had by its judgments, as well as by its citation of the New Jersey case, indisputably recognized the soundness of its conclusions.

Indeed, as late as 1884 the doctrine of the early cases of *Fanning* v. *Gregoire, supra*, and *Conway* v. *Taylor, supra*, was recognized in the case of *Ferry Company* v. *East St. Louis*, 17 *Otto* 365. In that case it was held that a state may impose a license fee, either directly or through one of its municipal corporations, upon the keepers of ferries living within the state for boats owned by them and used in ferrying passengers and goods from a landing in the state across a navigable river to a landing on the other side.

In that case it was said by Mr. Justice Woods: "The exaction of a license fee is an ordinary exercise of· the police power by municipal corporations. When, therefore, a state expressly grants to an incorporated city, as in this case, the power to license or tax and regulate ferries, the latter may impose a license tax on the keepers of ferries, although their boats ply between landings lying in two different states; and the act by which this exacting was authorized will not be held to be a regulation of commerce."

So we think there is nothing to distinguish the present case from that decided in *State* v. *Freeholders of Hudson County, supra*.

The next question is whether the doctrine announced in the last-mentioned case has been exploded by the decisions of the federal Supreme Court.

From what has been already exhibited it is quite clear that

up to 1884 the decisions of the federal tribunal were in harmony with the decisions of our court of last resort.

The insistence of the defendants in error is that a line of later cases in the United States Supreme Court has overruled these earlier cases, and has definitely settled the law in that court otherwise; and so settled it that a regulation of charges for passage over a ferry of the kind now in question by a state legislature, directly or indirectly, is a nullity.

If that tribunal has decided that the state legislation of 1799 is inimical to the clause of the federal constitution which confers upon congress the power to regulate commerce with foreign nations and among the several states, our decision, although of the highest court, must yield to the Supreme Court tribunal. A recognition of this rule, and a cheerful conformity with it is essential to the harmonious operation of our system of dual government. In the application of this rule of federal judicial supremacy, it is requisite to ascertain with precision whether the validity of the statute is *stare decisis* in the federal court.

One reason for the exercise of particular care to see that the question is definitely at rest in that court is, that if by our decision, rights set up under a state statute are annulled because of its supposed conflict with the federal constitution, there is no appeal; while if the validity of the state statute is affirmed, error lies to the federal court.

I think it may be taken as settled that the point in question must have been distinctly decided, and that the reasoning, references, illustrations and analogies contained in preceding opinions are not precedents. 26 *Cyc.* 170.

In the case of *Steamboat Company* v. *Livingston,* 3 *Cow.* 713, 731, Woodworth, J., in delivering the opinion of the Court of Errors of the State of New York, in speaking of the force to be given the federal decisions in *Gibbons* v. *Ogden,* 9 *Wheat.* 1, said: "In discussing the general nature of the power to regulate commerce among the states, and the effect of a license to carry on the coasting trade, the right of the state over its internal commerce was considered. But it is nowhere asserted in the opinion delivered that a license to

carry on a coasting trade extended to the commerce of the state purely internal. If from the reasoning we may conjecture, or even think it probable, that the supreme tribunal may on a future occasion carry the doctrine to that extent, we are not justified in reversing what has been solemnly and repeatedly adjudged in our own courts on such grounds. It must either be on the ground of an expressed decision by paramount authorities, or that on consideration of new points of view in which the question is presented we are satisfied our former decisions are erroneous."

So the question now presented is whether the federal Supreme Court has definitely decided that the doctrine laid down in State v. Chosen Freeholders of Hudson County· is erroneous.

The first of the line cases which is relied on by the defendants in error to exhibit the present attitude of the federal court is *Gloucester Ferry Co.* v. *Pennsylvania,* 114 *U. S.* 196, decided in 1885. In this case it was held that the State of Pennsylvania could not impose a tax upon the capital stock of a ferry company; and the ·want of power was put upon the ground that it was a tax upon interstate transportation. The decision was carefully confined to a denial of the power of the state to tax. Mr. Justice Fields did not even cite the cases of *Fanning* v. *Gregoire, supra,* and *Conway* v. *Taylor, supra,* but says: "It may be conceded   *   *   *   that the privilege of keeping a ferry with a right to take tolls for passengers and freight is a franchise grantable by the state, to be exercised within such limits and under such regulations as may be required for the safety, comfort and convenience of the public.

"Pennsylvania has never attempted to exercise its power of establishing or regulating ferries across the Delaware river. Anyone, so far as her laws are concerned, is free, as we are informed, to establish such ferries as he may choose. No license fee is exacted from ferrykeepers. She merely exercises the right to designate the places of landing, as she does the places of landing for all vessels engaged in commerce. The question, therefore, respecting the tax in the present case, is not complicated by any action of that state concerning ferries."

It is to be observed that while this case declares that the business of the kind then under consideration could not be taxed by the state, the only significance of the decision in the present discussion is to be found in the fact that the court declared the business of ferriage to be interstate commerce. This judicial declaration, however, did not antagonize any fundamental position upon which the decision in the case of State *v.* Chosen Freeholders of Hudson was grounded.

It is true that Judge Elmer said in that case: "Whether the power of regulating commerce between the states is to be considered as vested inclusively in congress, so that the legislature of the several states cannot constitutionally pass any law upon the subject, although it may not conflict with any existing treaty or law of the United States, has not yet been authoritatively settled by the Supreme Court of the United States. But conceding it to be so, the regulation of tolls on bridges and turnpike roads, and the fares on railroads and ferries, is not in a just sense a regulation of commerce, and has never been so regarded. It is a part of the general power of police, essential to every state and which could not with safety be, and has not been, surrendered to the general government."

It therefore appears that the conclusions reached by Judge Elmer were not reached by denying that the business of ferrying was interstate commerce, but by denying that the regulation of the tolls to be charged by a keeper of a ferry residing in this state was inimical to the power of congress to regulate commerce.

After the decision in the Gloucester Ferry Co. *v.* State of Pennsylvania case, Mr. Justice Bradley, in his opinion in the case of *Robbins* v. *Taxing District of Shelby County,* 120 *U. S.* 489 (1886), after recognizing the want of power in a state to tax interstate commerce, said: "It is also an established principle * * * that the only way in which commerce between the states can be legitimately affected by state laws, is, when by virtue of its police power and its jurisdiction over persons and property within its limits, a state provides for the security of the lives, limbs, health and comfort of per-

sons, and the protection of property; or when it does those things which may otherwise incidentally affect commerce, such as the establishment and regulation of highways, canals, railroads, wharfs, ferries and other commercial facilities."

The next case is *Covington and Cincinnati Bridge Co.* v. *Kentucky,* 154 *U. S.* 204, where it was held that a Kentucky statute fixing fares and tolls over a bridge connecting that state with the State of Ohio infringed the federal interstate commerce clause. The argument was that ferries had been held in the *Gloucester Ferry Co. case, supra,* to be an instrument of interstate commerce; and that an interstate bridge was in this respect similar to a ferry. It was held that there was no power in the state to regulate the rates to be charged for crossing an interstate bridge. In reversing the Court of Appeals of Kentucky, five judges held that the exclusive power to regulate tolls upon a bridge connecting two states was in congress, and four judges were of the opinion that the several states have the power to establish and regulate ferries and bridges and the rates of tolls thereon, whether within one state, or between two adjoining states, subject to the paramount authority of congress over interstate commerce. The four judges put their votes for reversal upon the ground that the attempt to regulate the tolls was in violation of the original act of incorporation of the bridge company.

It is to be remarked that in the majority opinion it was observed: "Nor are we to be understood as passing upon the question whether in the absence of legislation by congress the states may, by reciprocal action, fix upon a tariff which shall be operative upon both sides of the river."

Again, in his opinion in this case, Mr. Justice Brown said: "The adjudications of this court with respect to the power of the states over the general subject of commerce, are divisible into three classes—*first,* those in which the power of the state is exclusive; *second,* those in which the state may act in the absence of legislation by congress; *third,* those in which the action of congress is exclusive, and the states cannot interfere at all." In the second class he puts laws for

the establishment of ferries, citing *Conway* v. *Taylor,* 1 *Black* 603, *supra.*

Then came the case of *St. Clair County* v. *Interstate Land and Car Transfer Co.,* 192 *U. S.* 454. This case involved the validity of a statute of Illinois imposing a penalty for running a ferry without a license. The ferry consisted of a certain landing place, some cradles, steamboats barges, by which the Interstate Sand and Car Train Transfer Company ferried, for hire, railroad cars loaded and unloaded, across the Mississippi river from the Illinois to the Missouri shore.

The federal Supreme Court held that this method of transporting railway cars did not constitute a ferry in its restricted and legal significance. Mr. Justice White in his opinion pointed out the distinction drawn by Judge Shipman in the case of *New York* v. *New York and New England Transfer Co.,* 14 *Blatchf.* 159, between a boat upon which railroad, passenger and freight cars were run and carried by contract with a railroad from Jersey City to Mott Haven, in New York, and a ferry; and further recited that Judge Shipman, without denying the power of the city of New York to require a license for a ferry operating over the route in question, had held that the use of the boat in the manner specified was not the operation of a ferry. Mr. Justice White further recites the language of Judge Shipman to this effect: "The boat of the defendant is provided with two railroad tracks, which prevent the entrance or egress of ordinary vehicles, and also of foot passengers, except as they may be transported in cars which run upon the railroad tracks. The boat is exclusively used for the transportation of railroad cars in connection with the arrival of trains. It is impossible to transport ordinary vehicles upon the boat. It is impracticable to transport foot passengers, except as they are conveyed to the boat in cars. The whole arrangement of boats and docks is for the ingress and egress of railroad cars, and not for the accommodation of anything else. * * * Such a ferry is unlike an ordinary ferry for the transportation

across a river of persons, animals and freight, at intervals more or less regular for fare or toll."

After reciting this language of Judge Shipman, Justice White concluded that the transportation of railroad cars in the case before him was not the maintenance of a ferry in the proper sense of the term, but was business which was essentially interstate commerce. Having reached this conclusion, the learned justice proceeded to say that: "The only question was, did the county have the power to require the obtaining of a license by the company, as a prerequisite to the carrying on of such interstate commerce, and to impose the penalties sued for because a license had not been obtained?" The conclusion was that the county did not have this power. But the absence of the power was put upon the ground that such illegal conditions had been attached to the right to obtain the statutory license as relieved the company from the duty of complying with them.

The first of these conditions was that in granting a license citizens of Illinois were entitled to preference. The second of these illegal conditions was that the acceptance of the license imposed an absolute obligation upon the applicant to carry on a general ferry business as a prerequisite to its right to carry on its business of transporting cars; and so there was thus imposed a burden upon the latter business, which business was that of interstate commerce.

It is perceived that it was not decided that a license might not have been required by the state for the carrying on of interstate commerce; for the court having arrived at the conclusion that the license required was by reason of its discriminatory and burdensome accompaniments illegally exacted, the question of the right to exact any license at all disappeared.

The opinion concludes with a caveat against any inference being drawn from the language of the opinion, that it was intended to decide that the cases of *Fanning* v. *Gregoire* and *Conway* v. *Walker, supra,* had not been modified by later decisions, the judge remarking that the question had not been

considered because unnecessary to the decision of the case before them.

Now, so far as appears, the ferry company which figures in the present case was entirely unlike the corporation concerned in the St. Clair *v.* Interstate Transfer Company case.

The Weehawken Ferry Company seems to have been incorporated in 1852 with the usual privileges of a ferry company. Its business is the transportation of passengers and vehicles, as is that of any other ferry company. The railroad company, as lessee, is the keeper of the ferry and obliged to conduct the business of the ferry. There is no ground disclosed in the record which puts it upon the same footing as the Interstate Transfer Company.

Regarding it as a ferry, or as a ferry similar to the Gloucester ferry, the question is whether it has been definitely settled by the federal Supreme Court that the regulation of its tolls charged by its keeper in New Jersey is not a subject for regulation by the State of New Jersey.

It may be admitted that the logical inferences to be deduced from the later federal decisions are in favor of the view that when the precise question arises in the federal tribunal it will be held that the right to regulate tolls for the use of a ferry like the one in question resides alone in congress, and if the present question was new in this state the line of reasoning in the learned opinion delivered in our Supreme Court in this case would be strongly in that direction. But in the face of the adjudication in our court of last resort, made over fifty years ago, I think we should take no step in that direction beyond that taken by the federal court in actual decisions.

The Supreme Court of the United States, in dealing with this phase of interstate commerce, has had to recognize conditions which have sprung into existence, or increased in relative importance, within the last few years. In the light of these conditions, it has thought it wise to restate, modify, explain and adjust former statements, so as to meet with novel and shifting situations. It has done so respecting the position of interstate bridges and ferries in relation to in-

terstate commerce. But in executing this delicate function it has proceeded with cautious steps. It has decided nothing aside from what was absolutely essential to dispose of each case as it arose. It has decided that a ferry like the Gloucester ferry conducted a business of interstate commerce, as far as respected its immunity from state taxation; that an interstate bridge is like a ferry, an instrument for executing interstate commerce, and that a state cannot regulate the tolls over bridges. Nevertheless, it has expressly refrained from saying whether two states may not, by reciprocal action, fix a rate for tolls, and has refrained from saying that a state may not exact a license for operating a technical ferry. As no distinction is suggested between the exaction of a license and the fixing of tolls, so far as concerns the power to regulate commerce, it follows that there has been no decision which, except argumentatively, denies the power of the state to supervise the charges for ferriage.

In the St. Clair County case, if the court had understood that former cases had definitely established the proposition that interstate transportation of all kinds, whether known as ferries or otherwise, was immune from any state requirement of a license, that alone would have decided the case; but as already observed, the decision was put upon a ground which left open the question of the right of the state to require licenses for the operation of a technical ferry.

The importance of distinguishing between the acceptance as a finality that which has been distinctly decided, and in accepting, on the other hand, that which, by the logic of previous decisions ought to be decided, is suggested by the remark of Lord Chancellor Halsbury, in delivering his judgment in the House of Lords in the case of *Quinn* v. *Leathem* (1901), *A. C.* 495, to the effect that the latter course assumes that the law is necessarily a logical code; whereas every lawyer must acknowledge that the law is not always logical at all; the propriety of the former course is also suggested by the federal Supreme Court's careful circumscription of its latest decisions:

That the last word has not been said upon the subject in

hand by the Supreme Court of the United States is the opinion of a late writer on the regulation of commerce under the federal constitution. Mr. Calvert, on page 207 of his book upon that subject, remarks: "The extent of the power of states to authorize and regulate ferries has not been clearly determined. Power to regulate ferries over waters entirely within their limits is one that may be exercised exclusively by the states; but whether a state may license and regulate ferries over waters separating two states is still a debatable question." He then alludes to Mr. Justice White's concession *arguendo* in the St. Clair County case, and his definition of a ferry in the strict sense as confined to the transportation of persons with or without their property, and his intimation that the doctrine of the early cases had been modified.

My conclusion is that the decision of this court in the case of State *v.* Chosen Freeholders of Hudson County, which case controls the present, has not been overruled by the Supreme Court of the United States in any decision which makes the present question *res decisa* in that court.

It is again insisted that the regulation by the State of New Jersey is excluded because congress has legislated concerning ferries operated in connection with railroads. The congressional legislation thus alluded to is said to be contained in the Interstate Commerce act of 1887 and the amendments thereto; but all interstate commerce is not included within the operation of that statute. A ferry is not included. It is true that when a railroad company uses and operates a ferry, the latter, as a part of the railroad, becomes subject to the commissioners' control over railroads. *Jud. Int. Com.,* §§ 104, 105. The rates charged by a railroad company for passage over its route may be regulated, but the rates charged for ferriage simply, disconnected from the railroad transportation, is not under the control of the commission. Indeed, upon neither had the commission the power to fix rates until the amendment to the Interstate Commerce act, which amendment was approved June 29th, 1906, and so cannot affect the decision of this case, because

not in existence when the *certiorari* in this case was sued out on May 1st, 1906.

Whether, under the amendment of 1906, the power conferred upon the commission is not to fix rates, but to correct rates when inequitably fixed (1 *Drink. Int. Com. act, p.* 392, § 271), need not be discussed.

It is pointed out in the opinion of the Supreme Court that the treaty between New York and New Jersey (*Gen. Stat., p.* 3464), granted to the State of New York exclusive jurisdiction over the waters between the terminal points of these ferries, and so excludes any exertion of power by New Jersey in regulating, in any way, vessels moving upon those waters. It would seem, however, that whether the jurisdiction of the State of New York runs to the middle of the Hudson river or to the New Jersey shore, it would not affect the question now involved. The ferry-house is within the jurisdiction of New Jersey, and it is the right of the state to regulate the charges which the keeper of such ferry-house may impose for transportation to New York that is involved. Now, whether the transportation is partly or wholly over waters of the State of New York seems to be immaterial, for in the one case, as in the other, the transportation would be interstate commerce.

But apart from this, it is to be observed that the agreement entered into between the commissioners was ratified by the legislature of New Jersey in 1834. It had been in existence, therefore, nearly twenty years when the case of *State* v. *Chosen Freeholders of Hudson County, supra,* was decided, although this point was not noticed by either counsel or court in that case.

We would hardly, on that ground, disturb a decision so well considered which has stood for over half a century upon a new view of the effect of conditions which then existed.

Again, it is insisted that the resolutions are in conflict with the provisions of the Railroad act. *Pamph. L.* 1903, *p.* 656. The statutory provisions alluded to are section 19, which provides that where a terminus of a railroad is on the shore of any river or navigable water of this state, the rail-

road company may establish and operate ferries, or lease or maintain ferries for the transportation of persons and property on or across such navigable waters; and section 38, which permits a railroad company to charge for transportation reasonable rates for passengers, not exceeding three and three and a half cents per mile, and section 43, fixing the maximum rate for freight.

The operation of this act, by its language as well as by its title, seems to be restricted to traffic upon a railroad and upon a ferry which is made by the terms of the act a part of such railroad. When a ferry is an appendage of a railroad, under the provisions of this act, the right to fix reasonable rates for a railroad trip over its route, including the ferry, seems to be put exclusively in the hands of the railroad company. But a charge for a ferry trip, to be taken by a person other than a railroad passenger over a technical ferry existing as a distinct corporation, is not within the terms of the act, although the same ferry may be used for transportation of railroad passengers and freight.

Nor, in my judgment, do the resolutions attempt to include a fixing of fares to be charged by a railroad company for passage of its passengers over a portion of its road which may be over navigable waters. The resolution recites that "it appearing to the board that the rates to be taken at the several ferries specifically mentioned within the county of Hudson for the transportation and carriage of all foot passengers from the county of Hudson, shall be"—fixing the rates. Then follows the *"Be it resolved,* That this board fix the rate of ferriage to be charged by the aforesaid companies for the transportation of foot passengers from the county of Hudson, at the sums already mentioned in the opinion.".

This language seems to indicate that the board of chosen freeholders was dealing with charges to be made at the ferry in Hudson county for the transportation over ferries considered alone as technical ferries, and that they did not intend to deal with fares paid to a railroad company using the ferries as a part of its road under the statute of 1903.

Again, it is insisted that the rates fixed by the board of

chosen freeholders was an exercise of a power of confiscation and not regulation. It does not appear in any finding of fact by the Supreme Court, or any indisputable fact in the testimony, that the rates fixed by the board were confiscatory, and so the record presents no legal question for this court.

The judgment below must be reversed.

*For affirmance*—THE CHIEF JUSTICE, PARKER, VOORHEES, BERGEN, GRAY, J.J.   5.

*For reversal*—THE CHANCELLOR, GARRISON, REED, MINTURN, BOGERT, VREDENBURGH, VROOM, DILL, J.J.   8.